**HILL et al. v. TRIGG et al.    (No. 784–4444.)**

(Commission of Appeals of Texas, Section A. June 23, 1926.)

**1. Covenants ⊜51(2).**

Owner of land may create general building plan and sell lots subject to restrictions, or may abrogate plan entirely or modify it, so long as matter remains ex parte.

**2. Covenants ⊜84.**

Where owner sold half of lots in section subject to restrictive covenant that all houses front on private park, purchaser of unrestricted lot *held* not bound by restriction, though having knowledge that some of lots were restricted, there being no establishment of uniformly restricted district or general building plan.

Error to Court of Civil Appeals of Fourth Supreme Judicial District.

Action by R. K. Trigg and others against Sid Hill and others. Judgment for plaintiffs was affirmed by the Court of Civil Appeals (272 S. W. 237), and defendants bring error. Reversed and rendered.

Capps, Cantey, Hanger & Short, of Fort Worth, for plaintiffs in error.

Smith & Smith and Dedman & Potter, all of Fort Worth, and Ocie Speer, of Austin, for defendants in error.

NICKELS, J. On May 26, 1910, D. E. Phillips owned certain contiguous tracts of land known as "block 7" and "block 8," a part of the Handley townsite in the G. N. Butts survey, Tarrant county. On that day he prepared and filed for record (and the same was recorded) a map or plat of the land, of which the following is a reproduction:

To the map, as filed for record, was attached a statement (signed and acknowledged by Phillips) reading as follows:

"That I, D. E. Phillips, owner of blocks 7 and 8 of West Handley, the same being a portion of the G. N. Butts survey in Tarrant county, Tex., do hereby adopt the hereon map as correctly representing my plans for revising said block 7 and 8, to be known as 'Erie Hill place.' Private parks shown on said map are dedicated only for the use and benefit of the joint owners of Erie Hill place."

It will be noted that each of the "blocks" was thus divided into eight lots, each one of which is bounded by at least two streets, and each of eight of them is bounded by three streets (counting the "parkway" space and roadway as a street).

On June 18, 1910, Phillips sold 15 (of the 16 lots, retaining only lot O. He sold 11 of them to one purchaser (Mulkey), conveying them in two groups; one of the deeds granting lots A and H, in block 7, and M and N in block 8, and the other granting lots D and G in block 7, and I, J, K, L, and P in block 8. The deed first mentioned (i. e., to lots A, H, M, and N) contained this language (immediately following the description):

"Said conveyance is made subject to the following condition: All residences which may be built upon the land herein conveyed shall front the private parks as shown on the plat, and any failure to do so will cause forfeiture of all rights, title, and interest to the property herein conveyed, and ownership shall, without release or conveyance, or without suit or other action, be vested equally in the respective owners of each of the other places" (i. e., lots) "in this block."

But no such language was incorporated in the other deed to Mulkey (i. e., the deed conveying lots D, G, I, J, K, L, and P), and that instrument was in the ordinary form of a general warranty deed. It will be seen, thus, that all of the lots, except O, in block 8 were sold to Mulkey, and that the "condition" was stipulated only as to lots M and N in that block, and that 4 of the 8 lots in block 7 were sold to Mulkey, 2 of them with the "condition" named, and 2 of them without it. The 4 remaining lots in block 7 were conveyed, on the same day (i. e., June 18, 1910) to purchasers other than Mulkey, and by deeds containing the "condition." This left Phillips with one lot (O), and on February 25, 1911, he conveyed it, by general warranty deed (and without the "condition"), to Bracewell, so that the final result was that Phillips conveyed 8 of the 16 lots with the "condition," and 8 of them without it—so far, at least, as the matter may be judged by the various deeds and the language therein used.

Defendants in error, by mesne conveyances, became the owners of ("unrestricted") lot G in block 7, and of ("unrestricted") lots J, K, and L in block 8. Plaintiff in error likewise became the owner of ("unrestricted")

lot O in block 8. So far as the record shows, all of these mesne conveyances are evidenced by general warranty deeds, free of restrictive covenants or conditions. Crow's predecessor in interest had (prior to 1920) built a residence upon lot G, and the lot with improvements was then valued at "about $2,700." Trigg built a residence upon lot J in September, 1921; the completed house and lot being of a value of "about $1,800." Ferrell bought lot L (for $700), and thereon (in December, 1922) built a six-room residence costing $2,200. All of these improvements were so located as that they "fronted" on the "private parks." Early in 1923 Hill built a residence, garage, chicken house, and fences (costing about $2,000) on lot O. The most southwestwardly street shown upon the map referred to had, in the meantime, become the "Fort Worth-Dallas Pike," and Hill so arranged his buildings as that they "fronted" that highway; the garage and chicken house being placed upon the northeast side of the lot, and the garage being so arranged as that it had one set of doors opening to the northeast and another opening to the southwest.

The suit was filed by defendants in error ("for themselves, and also for the use and benefit of all and every other owner of lots" in said "Erie Hill place") March 14, 1923, shortly after Hill's improvements had been completed. They alleged, in substance, that by indirection (through the force of circumstances) the "condition" (which was in one of the deeds to Mulkey and in some of the other deeds) quoted above became imported into the grant to Hill's predecessor as a "restrictive covenant" as to the use of the land conveyed. The circumstances which, it is said, had this result consist of the pre-existence (within the knowledge or notice of Hill and his predecessors) of a "general building scheme," dating back to the filing of the map, and relating to it, which required all improvements to be "fronted" on the "private parks." Extrinsic proof of those things, it is claimed, has warrant in that clause of the "description" of lot O, wherein the lot is said to be "place O in Erie Hill place, according to the plat thereof" (set out above), and another clause which declares "said place O being 100x100 feet in size, and fronting on private parks." The relief prayed was forfeiture of Hill's property—in the alternative, recovery of damages in the sum of $10,000, with the further (alternative) prayer for judgment mandatorily requiring Hill (within 60 days) to "conform" his improvements so as that they shall "front" upon the "private parks." The case was tried with a jury. Hill's request for a peremptory instruction was refused. A verdict was returned upon special issues. Judgment was rendered finding that "plaintiffs, jointly and severally, have suffered substantial damages and injuries to their property rights" "in the sum of $1,400" at "the hands of Sid Hill,"

and thereupon awarding the mandatory injunctive relief prayed. The prayers for damages and forfeiture were denied. Hill appealed, and the case was transferred to the Court of Civil Appeals for the Fourth district, and there the judgment was affirmed. 272 S. W. 237.

Amongst the contentions presented is one to the effect that lot O is owned by Hill free of any such restriction as that undertaken to be impressed upon its use. Since we agree with that view, the other questions need not be discussed.

[1, 2] Absent contraventions of public policy and positive law, Phillips' liberty, as it existed when the map was filed and at all times up to the making of the deeds on June 18, 1910, included the absolute right to draw such pictures of his land as might suit his fancy, and to change his mind in respect to whatever scheme might have been theretofore envisioned. With equal freedom, so long as the matter was ex parte, he could declare that, when the lots might be sold, if ever, they should become a part of a "restricted district," and remain subject to named limitations, and thereafter he could abrogate the plan entirely or modify it to any degree. That power was a part of his ownership of the land. Curlee v. Walker, 112 Tex. 40, 244 S. W. 497; Spann v. City of Dallas, 111 Tex. 350, 235 S. W. 513, 19 A. L. R. 1387. How he used that undoubted authority is to be judged, of course, by what was said and done, in the light of those presumptions which belong to conveyances and import the broadest possible estate and least restriction upon subsequent use of the thing granted compatible with the language of the deeds. It should be remembered, also, that the so-called "restrictive covenant" is in the form of a condition subsequent, and itself declares a forfeiture of the estate in the event of breach, and that (of such form and import), as a matter of course, it cannot be added to Hill's muniments of title. Grubb v. McAfee, 109 Tex. 527, 212 S. W. 464. And while a court, in an appropriate case, has the right to say of a purported forfeiture clause that the true mutual intent gave it a different meaning, the fact that the restriction here in question is given that form, and includes the extreme penalty, has some meaning against a supposition of its proposed inclusion but inadvertent omission. Even when the matter is judged in the light most favorable to defendants in error, the words and acts relied upon to establish the "restrictive covenant" are characterized by much equivocation and by uncertainties of that degree which gives point to the basic justice of the presumptions mentioned. Property and liberty have a surer foundation than that left for Hill's rights, if their effective impeachment may be rested upon the circumstances disclosed in what actually took place.

In the first place, there was no effort whatever to restrict any of the lots to use for residence purposes. No reference was made, anywhere, to an inhibition against their use for any lawful purpose, and this omission, of necessity, includes a powerful argument against the intent to create a "restricted district" at all, and most certainly precludes the element of uniformity in any possible "general building plan." The maximum import of the words, as used in the strongest statement of the "condition" (where it was stated at all), is that, if residences shall be built upon the lots, they shall be made to "front" the parks.

In the second place, the map (which constitutes the important circumstances of origin of the general plan, according to the argument for restrictions) merely shows the dimensions and the location of the various lots in relation to streets and the "private parks." So far as any thing shown in the plat, or in the dedicatory words which accompany it, is concerned, the owner of any lot might as appropriately "front" his improvements to the southwest as to the northeast, and the owner of lots A, H, M, and N would have the additional choice of fronting toward the southeast and the owners of lots D, E, I, and P would have the northwest as an additional choice of direction, for the map discloses nothing to show that the streets platted were not of equal fitness as highways to pass by the "fronts" of buildings.

In the next place, the situation presented by the plat had a practical interpretation in the words and acts of all the parties then at interest and on the first relevant occasion. Up to June 18, 1910, the map and whatever latent meaning it may have had were intimate to Phillips. Between its filing on May 26th and the date last mentioned he did nothing, and said nothing, about it. But on the latter day he disposed of 15 of the lots, and kept one. Eleven of the 15 he sold to Mulkey, and in the deed (which Mulkey accepted) to 7 of those 15 he omitted the "condition," while (practically simultaneously) he embodied it in the deed to the other 4. He placed the "condition" in each of the deeds to lots sold to others than Mulkey. The result was that, on the same day, he placed the restriction on 8 lots, did not place it upon 7, and kept one lot for future use or sale. When he sold that lot (O) February 25, 1911, he omitted the condition from the deed, and this resulted in an exactly equal division of the 16 lots as between those restricted and those which were not. So far as we can perceive, this equal division is the sole element of uniformity in the entire history of "Erie Hill place." These facts, it will be noted, do not present a case of such immaterial or "explained" variations from a "general building plan" as that referred to in Hooper v. Lottman (Tex. Civ. App.) 171 S. W. 270, for the purpose of the "variations"

is not explained at all, and, in number, they are exactly equal to the instances of nonvariation. The practical construction thus given the matter on June 18, 1910, by the common vendor and the vendees (including, it will be remembered, the predecessors in title of each and all of the defendants in error) signifies one or more of three things, viz. (a) The author of the map and "dedication" did not originally contemplate "fronting" restrictions at all; or (b), if he had that intention, it was in respect alone to certain of the lots; or (c) if he originally contemplated "fronting" restrictions, and also intended for them to apply to every lot, he changed his purpose and plan while they were still entirely within his control. In no other way, as it appears to us, may the conjectured purposes be harmonized with what was written and done. And it results that the elements of purposed establishment of a uniformly restricted district which were present in Curlee v. Walker, supra, and in Hooper v. Lottman, supra, are all lacking here. It cannot be said that presumably the purchasers were ready to pay, and did pay, an enhanced price for the lots because of the existence of a general building plan, or that such a scheme entered into the consideration, for the purchaser of 11 of the lots took a deed which restricted 4 and another deed which omitted the restriction as to 7. On the facts, there is equal (if not greater) reason in saying that the omission of restrictions as to the 7 lots became a substantial element of consideration. The absence of essential facts which were present in the cases cited, and upon which the covenants there enforced were predicated, in our opinion, make those cases determinative of the questions here involved against the defendants in error.

We recommend that the judgments of the district court and of the Court of Civil Appeals be reversed, and that judgment be rendered for Sid Hill, plaintiff in error.

CURETON, C. J. Judgments of the district court and Court of Civil Appeals reversed, and judgment rendered for plaintiff in error.