**David H. SCOVILLE and Alice Faye Scoville, et al., Appellants,**

**v.**

**SPRINGPARK HOMEOWNER'S ASSOCIATION, INC., Appellee.**

**No. 05–89–00019–CV.**

Court of Appeals of Texas, Dallas.

Jan. 11, 1990.

Rehearing Denied Feb. 16, 1990.

Michael E. Robinson, Bruce Baldwin, Dallas, for appellants.

S. Eric Ragir, Debra R. Smith, Dallas, for appellee.

Before WHITHAM, BAKER and . OVARD, JJ.

## OPINION

WHITHAM, Justice.

In this declaratory judgment action, the homeowner-appellants, David H. and Alice Faye Scoville, Billy G. and Ruth W. Hannah, Jim E. and Carla S. Brown, Arthur Ray, Jr. and Sherry Rhodes, Gary and Linda L. Pinkham, Gary L. and Nancy Meinershagen, James E. and Barbara R. Brogan, Alan P. and Jordanna P. Whitheiler, Jack and Kathryn Vincent, Robert A. and Kyoko O. Mallon, Richard F. and Mary K. Handley, Stephen L. and Gwen N. Hanni, Jerry L. and Mary Margaret Taylor, Charles Robert and Ruth Ellen Hewes, Arthur Ray, Jr. and Karon Collier, James G. and Linda Burkhart, James S. and Wanda J. Harrison, Lloyd G. and Sue K. Magee, Bertram C. and Francis B. Jones, Vernon Ran and Betty L. Swearingen, Gregory Bruce Pulcini,

Joseph P. and Darlene Sircely, Aurelious A. and Diane Wiora, Jean F. Phipps Vielock, Rudy and Diana L. Melendez, Edward and Janet Sweda, Edward F. and Geraldine Kohlhaas, Larry L. and Marilyn L. Nulf, William Mendoza, Neal H. and Rita B. Ishman, Ramon Eugene and Janie Patricia Helms, Janet L. Walton, Bobby L. and Reva E. Smith, Neal P. and Evelyn L. Watts, Elton and Elisa Powers, Bruce R. and Sylvia K. Miller, Thomas C. and Deborah J. Connors, Kathleen V. Johnson, Paul R. and Tanya K. Engle, John M. and Carol A. Betty, Hui–Hsin Liu, Joseph C. Foster, Walter Y. and Grace Wen, John E. and Elizabeth H. Holderman, Robert and J. Leola Jolly, John H. and Donna L. Parker, Michael C. and Susan A. Bulkely, Richard D. and Rosemary J. DuMais, Robert E. and Nadine S. Lee, appeal from a summary judgment in favor of appellee, SpringPark Homeowner's Association, Inc. Both the homeowners and the association filed motions for summary judgment. The trial court granted the association's motion and denied the homeowners' motion. In their first and fifth points of error, the homeowners contend that the trial court erred in granting the association's motion and in denying the homeowners' motion. We agree. The principal issue is whether the homeowners can vacate certain use restrictions binding their properties and thereby escape payment of assessments. We conclude that the homeowners can do so. We conclude further that the trial court did not abuse its discretion in the award of attorney's fees to David and Mary Ann Somers. Accordingly, we affirm the trial court's judgment insofar as it awards the Somers attorney's fees, and we reverse the remainder of the trial court's judgment and render judgment that the association take nothing against the homeowners.

SpringPark is a planned residential community which lies partially in both Dallas and Collin Counties. The community was created in 1973 and was subdivided and platted as SpringPark West First Addition. The owner of the property filed a "Master Declaration" which set forth a general administrative scheme, covenants, restrictions and a statement of purposes. SpringPark was formed to acquire, improve and maintain common areas for the benefit of its members and to promote the health, safety, and welfare of its residents. The parks, playgrounds, open spaces and other amenities which were envisioned were acquired and maintained through the collection of annual assessments. The power to oversee the community, which included enforcing covenants and restrictions as well as collecting and disbursing assessments, was vested in the association.

The Master Declaration provided the developer with the right to annex and merge additional properties in future stages of development of SpringPark. These future additions were to be developed according to a general plan which was required to contain "a statement that the proposed additions, if and when completed, shall become subject to assessments for their just share of Association expenses." Every purchaser was to be apprised of the general plan prior to sale. SpringPark and any future additions to it were specifically subject to all the terms, provisions, covenants and conditions of the Master Declaration. Article II of the Master Declaration provided:

PROPERTY SUBJECT TO THIS DECLARATION:

ADDITIONS THERETO

\* \* \* \* \* \*

The additions ... authorized under this and the succeeding subsection shall be made by filing of record a supplementary Declaration of Covenants and Restrictions with respect to the additional property which shall extend the scheme of the covenants and restrictions of this Master Declaration to such property.

Any such Supplementary Declaration may contain such complementary additions and modifications of the covenants and restrictions contained in this Master Declaration as may be necessary to reflect the different character, if any, of the added properties as are not inconsistent with the scheme of this Master Declaration. In no event, however, shall any such Supplementary Declaration revoke, modify or add to the covenants estab-

lished by this Master Declaration as to the Existing Property.

Every owner of a lot subject to assessment by the Master Declaration was required to be a member of the association. Each owner agreed by covenant to pay and to be personally liable for assessments which were secured by a continuing lien upon the lot. Upon conveyance, the grantee automatically became a member of the association and subject to all the terms of the Master Declaration.

Amendments to the Master Declaration are governed by the following provisions:

Section 11.01 Binding Effect. The covenants and restrictions of this Master Declaration shall run with and bind the Properties subject to this Master Declaration, and shall inure to the benefit of and be enforceable by the Association and/or the Owner of any Lot or Living Unit subject to this Master Declaration, their respective legal representatives, heirs, successors, and assigns, for a term of thirty (30) years from the date that this Master Declaration is recorded, after which time this Master Declaration shall be automatically extended for successive periods of ten (10) years unless an instrument *signed by the Members entitled to cast seventy-five percent (75%) of the votes* of the Association has been recorded changing this Master Declaration in whole or in part.

Section 11.02 Amendments by Developer. Until such time as the first portion of the Properties is sold by Developer, Developer, at its discretion, may abolish, amend, restate or supplement this Master Declaration in whole or in part.

Section 11.03 Amendments by Members. Except as provided in Sections 11.-01 and 11.02, this Master Declaration may be abolished, amended and/or changed in whole or in part *only with the consent of seventy-five percent (75%) of the total number of Members* of each Class of the Association evidenced by a document in writing bearing each of their signatures.

(emphasis added).

In 1977, the SpringPark West Second Addition (Second Addition), consisting of fifty-seven lots, was annexed and merged into the association through a requisite supplementary declaration entitled "DECLARATION OF USE RESTRICTIONS RESTATED" (Use Restrictions). Both the Use Restrictions and the Master Declaration were prepared and signed on behalf of the Aren Corporation—the "Developer." Article II of that document governs assessments and provides that each Second Addition homeowner covenants and agrees to pay and be personally liable for the assessments and fees provided for in the Master Declaration. It also states that assessments levied pursuant to the Master Declaration are secured by a continuing lien upon the Second Addition lots.

Article III which follows is entitled "PERMITTED USES AND RESTRICTIONS" and encompasses twenty-two areas of concern to the owners of the Second Addition lots. Its sections variously regulate and restrict considerations such as exterior cladding materials and colors, setback requirements, garage door location, and roofing materials and colors. Immediately following these enumerated use restrictions is the provision which the homeowners invoke in their effort to secede from the association.

Section 3.01 Duration and Amendment. The covenants and restrictions contained in these Use Restrictions shall run with and bind the Properties subject to these Use Restrictions and shall inure to the benefit of and be enforceable by the Owners of the Lots subject to these Use Restrictions, their respective legal representatives, heirs, successors, and assigns, for a term of thirty (30) years from the date that these Use Restrictions are recorded. Thereafter, these Use Restrictions shall be automatically extended for successive period of ten (10) years provided, however, that the Owners of seventy-five percent (75%) of the Lots may, at the end of such thirty (30) year term or at the end of any successive ten (10) year period thereafter by a written instrument recorded in the Deed Records, Dallas County, Texas, vacate or

modify all or part of these Use Restrictions; provided, however, no such vacation or change shall be effective unless made and recorded at least one (1) year prior to the effective date thereof. During the initial thirty (30) year term *a vacation or modification hereof shall be effective if a written instrument be signed by ninety percent (90%) of the Owners of the Lots.* Any such vacation or modification shall be 'filed of record in the Dallas County Deed Records promptly when executed.

(emphasis added).

During the ten years that followed the Second Addition annexation, discord developed culminating in the Second Addition homeowners' attempt to form a new homeowner's association. In 1987, the Second Addition homeowners filed a document entitled "SECOND AMENDMENT TO DECLARATION OF USE RESTRICTIONS RESTATED."[1] In the Second Amendment, the Second Addition homeowners elected to secede from the association, rescind its authority, and eliminate all reference to the Master Declaration from the Use Restrictions.

 The law recognizes the right of parties to contract with relation to property as they see fit, provided they do not contravene public policy and their contracts are not otherwise illegal. *Curlee v. Walker,* 112 Tex. 40, 43, 244 S.W. 497, 498 (1922). The rules of construction which apply in construing contractual provisions are equally applicable in construing covenants and restrictions such as are before us. *See Parker v. Delcoure,* 455 S.W.2d 339, 343 (Tex.Civ.App.—Fort Worth 1970, writ ref'd n.r.e.). The intent of the parties must be ascertained from the instruments as a whole. *See Dallas Joint Stock Land Bank v. Harrison,* 138 Tex. 84, 92, 156 S.W.2d 963, 967 (1941); *Parker,* 455 S.W.2d at 343. Several instruments pertaining to the same purpose, whether executed contemporaneously or at different times, will be read together. *See Board of Ins.*

*Comm'rs v. Great S. Life Ins. Co.,* 150 Tex. 258, 267–68, 239 S.W.2d 803, 809 (1951); *U.S. Life Title Co. v. Andreen,* 644 S.W.2d 185, 190 (Tex.App.—San Antonio 1982, writ ref'd n.r.e.). Indeed, all parties to this appeal agree that the instruments in question are clear and unambiguous and that any "intent" must be determined from the four corners of the instruments themselves under *Peveto v. Starkey,* 645 S.W.2d 770 (Tex.1982). With these rules in mind, we consider the Master Declaration, together with the Use Restrictions, and now seek to harmonize and give effect to all the provisions so that none will be rendered meaningless. *See Universal C.I.T. Credit Corp. v. Daniel,* 150 Tex. 513, 518, 243 S.W.2d 154, 157–58 (1951).

The association brought this suit to challenge the legal effect of the action taken by the homeowners of lots in the Second Addition to vacate all or part of the Use Restrictions binding their properties. The action by the homeowners was taken pursuant to Article III § 3.01 of the Use Restrictions entitled Duration and Amendment. The homeowners assert that the apparent and objective intent of section 3.01 is that the Use Restrictions, which are contractual in nature, bind the properties in the Second Addition for a stated term of years unless such Use Restrictions are vacated during such term by a written instrument signed by ninety percent (90%) of the homeowners. The homeowners assert that the autonomy and independence of the homeowners from the association may be achieved by following the mandates of section 3.01. The association contends that such autonomy and independence of the homeowners cannot be achieved without the consent of seventy-five percent (75%) of all members of the association. The trial court construed the provisions of the Master Declaration which created the association and the Use Restrictions against the homeowners.

██ The issue presented is whether the language of section 3.01 of the Use Restric-

---

**1.** The first amendment occurred four years earlier when the Second Addition homeowners amended their use restrictions to include composition shingles among the permissible roof cladding materials.

tions conveys unambiguously the declarant's intent that the homeowners have the power to wholly vacate the Use Restrictions and thereby cease to be subject to assessments by the association. The pertinent language to be construed is set forth as follows:

> During the initial thirty (30) year term a *vacation* or modification hereof shall be effective if a written instrument be signed by ninety percent (90%) of the Owners of the Lots. Any such *vacation* or modification shall be filed of record in the Dallas County Deed Records promptly when executed.

(emphasis added). The plain meaning of the term "vacate" is to set aside. The term "hereof" refers to the Use Restrictions. The power to completely vacate the Use Restrictions is consistent with the other terms of duration in section 3.01. First, section 3.01 sets forth a fixed term of years for the enforceability of the Use Restrictions. Thereafter, it sets forth the manner and means by which said duration may be extended or shortened. Therefore, we conclude that the language of section 3.01 allows the homeowners to shorten the term or duration of the enforceability of the Use Restrictions by filing a written instrument signed by ninety percent (90%) of the homeowners.

The narrower issue presented is whether the homeowners have the power to vacate the provisions in the Use Restrictions pertaining to assessments. Section 2.01 of the Use Restrictions states that each homeowner shall pay assessments to the association. Section 3.01 of the Use Restrictions is the only paragraph which addresses the powers of the homeowners to vacate all or part of the Use Restrictions. That section does not make any exception to the general power to vacate all or part of the Use Restrictions. Furthermore, the declarant intentionally set forth the assessment provisions of Article II in the Use Restrictions, even though the Master Declaration contained similar language, to convey his intention that the assessment provisions were subject to vacation pursuant to Article III. This deliberate act of the declarant is especially significant in light of the asso-

ciation's contention that membership in the association cannot be separated from the assessments restriction. Further, as noted above, the same declarant prepared and signed *both* the Use Restrictions and the Master Declaration. The rule of construction espoused in *ETL Corp. v. Forrester,* 667 S.W.2d 247 (Tex.App.—Dallas 1984, no writ), is that in order to determine the intent of parties to a contract and the extent to which they intended to be bound, it is the duty of the court to construe a contract as an entire instrument, and to consider each part with every other part so that the effect and the meaning of one part on any other part may be determined in such a way that all parts, if possible, are given effect. *ETL Corp.,* 667 S.W.2d at 250. Section 2.01 is properly incorporated in section 3.01 by the phrases "vacate or modify all or part of these Use Restrictions" and "vacation or modification hereof." Thus, we conclude that the homeowners have the power to vacate any and all provisions in the Use Restrictions, including those pertaining to assessments payable to the association.

The issue raised by the association is whether the homeowners are required to seek an amendment of the Master Declaration to effect the homeowner's intent to cease to be subject to assessments by the association. If an amendment of the Master Declaration is required, then seventy-five percent (75%) of all members of the association must evidence their consent. If such an amendment is not required, then no consent by seventy-five percent (75%) of the members is required to give effect to the action of the homeowners. Section 11.03 of the Master Declaration states, in pertinent part, as follows:

> [T]his Master Declaration may be abolished, amended and/or changed in whole or in part only with the consent of seventy-five percent (75%) of the total number of Members of each Class of the Association evidenced by a document in writing bearing each of their signatures.

Hence, we reach the question as to which provisions of the Master Declaration does the association claim were in effect amend-

ed or must be amended to give effect to the homeowners' intent. The plain meaning of the term "amend" is to change, correct or revise. *Continental Cars, Inc. v. Texas Motor Vehicle Com'n.*, 697 S.W.2d 438, 441 (Tex.App.—Dallas 1985, writ ref'd n.r.e.). In order for a subsequent instrument to amend the original restrictive covenant, the instrument creating the original restrictions must establish both the right to amend such restrictions and the method of amendment. *Couch v. Southern Methodist Univ.*, 10 S.W.2d 973, 974 (Tex.Comm'n App.1928, judgm't adopted); *Hanchett v. East Sunnyside Civic League*, 696 S.W.2d 613, 615 (Tex.App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.). As to the homeowners in the Second Addition, the "original restrictive covenants" are contained in the Use Restrictions (which originally encompassed the entire Master Declaration), not the Master Declaration. The action of the homeowners in vacating *their Use Restrictions* did not change or purport to change the meaning or validity of any of the provisions of the Master Declaration. Thus, the Master Declaration was not in effect amended. For illustration, the definition of the term "member" in the Master Declaration does not change simply because the homeowners' action asserted their non-membership. Furthermore, the general authority of the association to make its members liable for the payment of assessments has not been limited or changed in any way. The specific authority of the association to collect assessments from the homeowners of lots in the Second Addition was granted by the Use Restrictions, not the Master Declaration. Thus, vacation of the Use Restrictions, or modification thereof, is the effective means of abrogating that authority. The homeowners did not in effect amend or purport to amend the Master Declaration, as the association contends, because such amendment was not required and no amendment in effect resulted from their action.[2]

The association challenges the homeowners' privilege to act independently of the association members who do not reside in the Second Addition. However, the cases of *Loving v. Clem*, 30 S.W.2d 590 (Tex.Civ.App.—Dallas 1930, writ ref'd); and *Meyerland Community Improvement Association v. Temple*, 700 S.W.2d 263 (Tex.App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.), support the right of the homeowners to change their restrictive covenants pertaining to the Second Addition without the intervention of lot owners in other sections or additions even if the result is inconsistent with the general plan or scheme. In *Loving*, the subdivider had created different sections within a single subdivision, with provisions for amendment varying in the different areas. This Court held that since the different provisions for amendment apply to different sections, it was the intention of the sub-divider that lot owners in each section had the power to alter the restrictions in their own area without the intervention of lot owners in another section. *Loving*, 30 S.W.2d at 592–93. In *Meyerland*, approving of the decisions in *Loving* and *Couch*, the court upheld the action of the owners of lots in a certain sub-addition of the Meyerland Addition who adopted amended restrictions which allowed their property to be used for nonresidential purposes, contrary to the general plan of the entire addition. *Meyerland*, 700 S.W.2d at 266.

We conclude that the principles of the decisions in *Meyerland* and *Loving* are applicable to the present case. In the present case, the declarant filed Use Restrictions with provisions for amendment or vacation which varied from the provisions for amendment or abolishment in the Master Declaration. This variation was deliberate and intentional and thus was made for a purpose. Thus, we conclude that an objective and reasonable construction allows the homeowners to vacate the Use Restrictions without the intervention of members of the

**2.** "[T]he owners of that portion of the addition within the territory affected by this suit, have, by their proposed amendment, completely destroyed or removed the restrictions within that

district, nevertheless such was clearly their right under the power conferred in the [Use Restrictions]." *Couch*, 10 S.W.2d at 974.

association who do not reside in the Second Addition.

The reasonable, apparent and objective intent of section 3.01 of the Use Restrictions, construed even in light of the provisions of the Master Declaration, is that the homeowners of lots in the Second Addition have the right to vacate the Use Restrictions without the intervention of members of the association residing outside of the Second Addition. It follows that the trial court erred in granting the association's motion for summary judgment and in denying the homeowners' motion for summary judgment. We sustain the homeowners' first and fifth points of error. When both parties file motions for summary judgment and one such motion is granted, then the trial court's judgment is final and appealable and, on appeal, this court should determine all questions presented. *Tobin v. Garcia*, 159 Tex. 58, 64, 316 S.W.2d 396, 400 (1958). If reversible error is found, this court should render such judgment as the trial court should have rendered. *Tobin*, 159 Tex. at 64, 316 S.W.2d at 400.

In their fourth point of error, the homeowners contend that the trial court erred in requiring them to pay the attorney's fees of two co-defendants to the exclusion of all other co-defendants and the association. The co-defendants receiving the award of attorney's fees were David and Mary Ann Somers. Regrettably, neither the homeowners nor the association cite to the record or explain the procedure by which the award was obtained. We have no statement of facts. For the purposes of this opinion, we assume, but do not decide, that the record contains the following facts which we learn from the association's brief. The Somers were co-owners of a lot in the Second Addition. By virtue of that fact alone, the Somers were named defendants pursuant to the Uniform Declaratory Judgments Act. TEX.CIV.PRAC. & REM.CODE ANN. § 37.006(a) (Vernon 1986). The Somers did not join in the signing of the Second Amendment. The Somers did not agree with homeowners that the Second Amendment was effective to withdraw the Second Addition from the association.

In short, the Somers were in alliance with the association and were joined as co-defendants only for the purposes of the Act. These facts assumed, we proceed. By our independent review of the final judgment, it appears the trial court made the award in disposing of the association's motion for summary judgment. For the purposes of this opinion, we assume, but do not decide, that in some manner, or by some means, the trial court had sufficient basis upon which to ground the award. On this assumption, we proceed to dispose of the homeowners' challenge to an award of attorney's fees to the Somers under the Act.

The Act provides that the trial court may award costs and reasonable and necessary attorney's fees as are equitable and just. TEX.CIV.PRAC. & REM.CODE ANN. § 37.009 (Vernon 1986) (formerly TEX.REV.CIV.STAT. ANN. art. 2524-1, § 10). An abuse of discretion standard should be invoked upon review of the award. *Contact Products, Inc. v. Dixico, Inc.*, 672 S.W.2d 607, 610 (Tex.App.—Dallas 1984, no writ). Moreover, an award of attorney's fees under the Act is not limited to the prevailing party. *District Judges v. Commissioners Court of Collin County*, 677 S.W.2d 743, 746 (Tex.App.—Dallas 1984, writ ref'd n.r.e.). Instead, the Act dictates an "equitable and just" standard. The homeowners do not argue that the award was not equitable and just. It follows that we cannot hold that the trial court abused its discretion. *See District Judges*, 677 S.W.2d at 746 (award of attorney's fees to the judges under the Act upheld although the commissioners court prevailed on all issues in the trial court and on appeal). We conclude, therefore, that the trial court did not abuse its discretion in making the award of attorney's fees. We overrule the homeowners' fourth point of error.

In its sole cross-point, the association contends that the homeowners brought this appeal solely for the purpose of delay and the association should be compensated for the delay. In light of our disposition of this appeal, we overrule the association's cross-point.

We affirm the trial court's judgment insofar as it awards the Somers attorney's fees. We reverse the remainder of the trial court's judgment, and we render judgment that the association take nothing against the homeowners.

OVARD, J., dissents with opinion.

OVARD, Justice, dissenting.

I dissent from the Majority who, in my opinion, have isolated section 3.01 of the West II Declaration,[1] not only from the other provisions of the West II Supplemental Declaration but also from the Master Declaration. In so doing, they have arrived at an unsound conclusion which violates the developer's stated intent and the general scheme for development.

In the area of land use management, the homeowners' association has recently emerged as a developing area of substantive law that draws upon concepts from real estate, corporate, municipal, and constitutional law. In order to understand the issues presented by this case, it is essential to consider the unique interrelationship between a homeowners' association and its members. The development of the homeowners' association and its postdevelopment operation are inextricably linked. *See* W. HYATT, CONDOMINIUM and HOMEOWNER ASSOCIATION PRACTICE: COMMUNITY ASSOCIATION LAW § 1.03 (2d ed. 1988). The essential element of the association is the mandatory membership requirement in which all purchasers automatically become members, subject to the associations' procedures and powers. *See Perry v. Bridgetown Community Ass'n*, 486 So.2d 1230, 1232–33 (Miss.1986). In an association, there is a common interest in the use or ownership of property. *See Pooser v. Lovett Square Townhomes Owners' Ass'n*, 702 S.W.2d 226, 231 (Tex.App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.). The mandatory membership aspect, coupled with the unique powers provided to the association, distinguishes it from the more traditional voluntary neighborhood development. It has been analogized in a loose sense to a "private government," and the documents creating it are "viewed much like ... a constitution." HYATT, *supra* § 1.05(a)(1) at 11; *see Pooser*, 702 S.W.2d at 231. The association has the power to levy and collect assessments, and it has a lien with which to enforce the obligation. The basic creating document is the Master Declaration. It contains the plan of development and ownership, the proposed method of operation, and the rights and responsibilities of the owners within the association. It is a "covenant running with the land in that it is recorded in the land records and, like a deed, continues to apply to every person who becomes a property owner." HYATT, *supra* § 1.05(b)(3) at 19.

The issue in this case, drawn most narrowly, concerns the developer's intention in effectuating section 3.01 in light of the obvious intent of the master scheme for development. We ascertain intent from the instruments as a whole, not from an isolated clause or paragraph. *See Dallas Joint Stock Land Bank v. Harrison*, 138 Tex. 84, 92, 156 S.W.2d 963, 967 (1941); *Parker v. Delcoure*, 455 S.W.2d 339, 343 (Tex.Civ.App.—Fort Worth 1970, writ ref'd n.r.e.). Several instruments pertaining to the same purpose, whether executed contemporaneously or at different times, are read together as one agreement. *See Board of Ins. Com'rs v. Great S. Life Ins. Co.*, 150 Tex. 258, 267, 239 S.W.2d 803, 809 (1951); *U.S. Life Title Co. v. Andreen*, 644 S.W.2d 185, 190 (Tex.App.—San Antonio 1982, writ ref'd n.r.e.). Additionally, the wording of the instruments will be considered in light of the circumstances surrounding their execution. *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 731 (Tex.1981). Our paramount concern is to harmonize and give effect to all the provisions of the Master Declaration and the West II Declaration so that none are rendered meaningless. *See Universal C.I.T. Credit Corp. v. Daniel*, 150 Tex. 513, 518, 243 S.W.2d 154, 157–58 (1951).

Viewing the instruments in light of these rules, the developer's intentions are clear.

---

**1.** The "use restrictions" referenced by the majority are designated as the "West II Declaration" for the purposes of this dissent.

As developer and creator, his stated purpose was to bind each owner to all other owners to effectuate the purposes of the Association.[2] Accordingly, membership in the Association was not voluntary. Assessments were not voluntary. Nor did he intend for West II to opt out of the Association with the concurrence of ninety percent of its owners.[3]

The analysis which compels me to this conclusion must logically begin with the Master Declaration wherein the developer states on page one:

WITNESSETH:

\* \* \* \* \* \*

WHEREAS, Developer desires to provide for the preservation of the values and amenities in said community and for the maintenance of said parks, playgrounds and open spaces, and, to this end, desires to subject the real property described in Article II[4] *together with such additions* as may hereafter be made thereto (as provided in Article II) *to the covenants*, restrictions, easements, charges and liens *hereinafter set forth*, each and all of which is and are for the benefit of said property and each owner thereof....

(Emphasis added.)

On the following page of the Master Declaration, the developer again reiterates

that SpringPark and *future* additions thereto shall be subject to the "Master Declaration and all [its] terms, provisions, covenants, and conditions." Next, the developer provided for the manner and means by which such future additions would merge into the Association. Additions became subject to the Master Declaration by filing a "Supplementary Declaration" which incorporated the covenants of the Master Declaration within its terms. These Supplementary Declarations could contain complimentary modifications of the covenants and restrictions contained in the Master; however, *inconsistent* additions or modifications were expressly prohibited. Membership in the Association was mandatory for every lot owner subject to assessment and every member agreed by covenant to pay assessments. These covenants and restrictions ran with the land and were enforceable on any lot subject to the Master Declaration unless seventy-five percent of all Association members voted to the contrary.

Two sections, 11.01 and 11.03, provide the only means of changing the Master Declaration.[5] Section 11.01 provides that covenants and restrictions "shall run with and bind the Properties subject to this Master Declaration" and shall be enforceable unless seventy-five percent of all the Asso-

2. In the Master Declaration, the developer states that SpringPark was formed to acquire, improve, and maintain common areas for the benefit of its members and to promote the health, safety, and welfare of its residents. These goals, of course, could only be accomplished through the collection and disbursement of assessments.

3. "[M]any purchasers do not understand that community associations are mandatory membership associations in which all property owners must join. This misunderstanding is exacerbated by the occasional mistaken assumption that the relationship is one of contract that might be varied or cancelled by a dissatisfied party.... It is hard for some owners initially to understand the fact that they have vested in an elected board of directors a substantial amount of authority and control over the use of their home and the common property. Equally difficult to understand when disagreements arise is the fact that the declaration is an enforceable restriction, binding on all parties, which mandates that certain actions may be

taken and that certain actions not be taken in the use and enjoyment of one's property." HYATT, *supra* § 3.06, at 59–60.

4. Article II is entitled "PROPERTY SUBJECT TO THIS DECLARATION: ADDITIONS THERETO." The "real property" referred to by the developer was the land which comprised SpringPark at the time of its creation.

5. Section 11.02 empowered the developer to amend the Master Declaration until such time as the first portion of the subject properties was conveyed. This section ceased to be operative when the first portion of the subject properties was conveyed by the developer. This is in accord with the well settled rule that a developer may only abrogate or modify a plan ex parte if none of the restricted property has been sold. *See Burns v. Wood*, 492 S.W.2d 940, 944 (Tex. 1973); *Hill v. Trigg*, 286 S.W. 182, 184 (Tex. Comm'n App.1926, judgm't adopted); *Parker*, 455 S.W.2d at 343.

ciation members vote to the contrary. Section 11.03 mandates that, except as provided in section 11.01, the Master Declaration may not be changed, amended, or abolished to any extent without the consent of seventy-five percent of all the Association members. These provisions, recorded in 1973, leave no doubt as to the developer's intentions when he formed the Association; all Association owners must pay assessments, and no owner can change this provision of the master plan without the requisite vote from all members.

The record reflects that after the filing of the Master Declaration, thirteen supplemental declarations were filed, all of which created additions to SpringPark as contemplated by the Master Declaration. Among these was West II, which was added in 1977 by means of the requisite Supplemental Declaration (West II Declaration). The developer/owner of SpringPark was also the developer/owner of the property constituting West II. Within the provisions of the West II Declaration entitled "Assessments," the developer made numerous references to the manner in which the West II owners were required to conform to the Master Declaration:

1. The developer and each owner covenants and agrees to pay assessments levied by the Association as provided in Article V of the Master Declaration.

2. The developer and each owner covenants and agrees that assessments levied pursuant to the Master shall attach and remain a charge upon each West II lot, secured by a continuing lien upon each lot "enforceable in accordance with all the terms and provisions of the Master Declaration."

3. Assessments·levied by the Association pursuant to the Master Declaration shall be used for promoting the welfare of the owners of SpringPark and also for "enforcing the covenants and restrictions contained in the Master Declaration."

4. The developer agreed to convey designated common areas within West II to the Association pursuant to and in accordance with section 4.02 of the Master Declaration.[6] (This fact alone is a compelling indication that the developer intended that West II remain subject to the Association until such time as seventy-five percent of all members agreed to their independence. In my view, this fact highlights the illogical conclusion reached by the majority. Why would the developer agree to and subsequently convey title to real property within West II if he truly intended for them to withdraw from the Association based on their own vote?)

As envisioned by the Master Declaration, the developer included in the West II Declaration a section entitled "Permitted Uses and Restrictions." This section contains twenty-two restrictions which regulate the character and uses of the West II lots. Immediately following these use restrictions is section 3.01 which provides as follows:

> The covenants and restrictions contained in these *Use Restrictions* shall run with and bind the Properties subject to these *Use Restrictions* and shall inure to the benefit of and be enforceable by the Owners of the Lots subject to the *Use Restrictions* ... for a term of thirty (30) years from the date that these *Use Restrictions* are recorded.... During the initial thirty (30) year term a vacation or modification *hereof* shall be effective if a written instrument be signed by ninety percent (90%) of the Owners of the Lots....

(Emphasis added.)

The purpose of section 3.01 is clear. It was intended to allow the West II owners to vacate or modify any of the use restrictions that pertained to their addition. This would have included, for example, any of the twenty-two restrictions contained in the

---

6. Later, this agreement was memorialized by a Quit Claim Deed wherein the developer deeded a 0.221 acre tract lying within West II to the Association. This tract has been owned and maintained by the Association as a common area since its conveyance. The deed recites that it was made "for the express purpose that [the Association] may own, occupy and hold the Premises as additional Common Areas and Common Properties pursuant to the general scheme established by the Master Declaration and the West II Supplemental Declaration."

West II Use Restrictions such as roofing materials, exterior cladding materials and colors, or set-back requirements. However, to the extent that a modification or revocation pertained to a matter which was inconsistent with the Master Declaration, it required the consent of seventy-five percent of the total number of members in the Association. This interpretation is entirely consistent and harmonious with the master plan.

We have been presented with a carefully drafted master plan with built-in procedures for future development which defined future relationships in terms of mandatory membership and assessments and which provided the method for making changes thereto. In spite of the aforementioned, the Majority reads section 3.01 to say that the developer intended to permit West II to secede by a ninety percent vote of the subdivision. To support a result which is contrary to the overall strategy for development, the Majority relies on two cases: *Loving v. Clem*, 30 S.W.2d 590 (Tex. Civ.App.—Dallas 1930, writ ref'd n.r.e.) and *Meyerland Community Improvement Ass'n v. Temple*, 700 S.W.2d 263 (Tex.App. —Houston [1st Dist.] 1985, writ ref'd n.r. e.), neither of which is on point. Both of these cases involved traditional residential developments in which certain residents desired to convert their property from residential to nonresidential use. Both cases required the interpretation of deed restrictions and the ability to amend restrictive covenants contained therein. However, neither of these cases involved a homeowners association established pursuant to a recorded master plan for development.

The Majority claims that West II's election to secede from the Association and thereby terminate its obligation to pay assessments did not change any of the provisions of the Master Declaration. Did section 3.01 abolish, amend, or change the Master Declaration? There can be no doubt that under the Majority's interpretation it did. The covenant to pay assessments, together with the voting provisions to effect changes thereto, has been rendered a nullity. Additionally, the Majority has abrogated the developer's stated desire that lots in future additions be subject to "all terms, provisions, covenants, and conditions" of the Master Declaration.

In order for a subsequent instrument to amend the original restrictive covenant, the instrument creating the original restrictions must establish both the right to amend such restrictions and the method of amendment. *Couch v. Southern Methodist Univ.*, 10 S.W.2d 973, 974 (Tex.Comm'n App.1928, judgm't. adopted); *Hanchett v. East Sunnyside Civic League*, 696 S.W.2d 613, 615 (Tex.App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.). Additionally, the right to amend such restrictions implies only those changes contemplating a correction, improvement, or reformation of the agreement, rather than a complete destruction of it. *Couch*, 10 S.W.2d at 974. Here, according to the Majority, the instruments allowed West II, without the consent of the Association, to alter the subject matter of the agreement so as to destroy it. *Id.*[7]

---

**7.** Developers' attempts to vary the developmental scheme and its basic concept have been unsuccessful even when there has been a retention of a unilateral right to amend. In *Flamingo Ranch Estates, Inc. v. Sunshine Ranches Homeowners, Inc.*, 303 So.2d 665, 666 (Fla.Dist. Ct.App.1974), the developer sought to exercise that unilateral amendment power. On several prior occasions, it had done so without objection, although the previous amendments had not been inconsistent with the general scheme of development. The amendment that the court was considering sought to change the development's complexion by permitting a mix of business and residential complexes. The court rejected the proposed amendment and held that the unilateral right to amend contained in the original Declaration of Restrictions had to be read in light of a "requirement of reasonableness," and further held that to permit the complexion of the project to be changed would "destroy the general scheme or plan of development." *Id.*

In *Wright v. Cypress Shores Development Co.*, 413 So.2d 1115, 1124 (Ala.1982), the Alabama Supreme Court held that where a general scheme for development is created, a reservation of the right to annul, cancel, amend, or modify the restrictive covenants could only be exercised in a reasonable manner consistent with the general plan for development. *Id.*

A recent Alabama trial court decision reformed a Declaration of Covenants, Conditions, and Restrictions to strike an amendment executed by the developer that made the mandatory

In summary, the West II Supplemental Declaration was just that—it served to supplement the Master Declaration in a complementary way. Its purpose was twofold: primarily, it brought West II into the fold of the Association and subjected it to all the provisions of the Master Declaration; secondarily, as envisioned, it provided the West II owners their own set of aesthetics in the form of twenty-two use restrictions which, according to section 3.01, could be altered by vote of ninety percent of the West II owners.

Following the creation of the Master Declaration and the sale of the first lots thereunder, each purchaser in the Association had the right to rely on the fact that all purchasers took subject to the restrictive covenants, unless modified in accordance with the Master Declaration. The effect of allowing West II, on its own, to secede from the Association does violence to the general scheme of development. Such a result is not only manifestly unfair to the other Association members but contrary to the intent of the developer. Therefore, I conclude that the West II owners were members of the Association and that the developer's intent rendered ineffective the attempted secession by West II from the Association, given the manner in which it was done. I would overrule all of West II's points of error and affirm the judgment below.

membership nature of the association optional for a purchaser with loans guaranteed, insured, or purchased by the Veterans Administration, the Federal Home Administration, the Federal National Mortgage Association, or the Federal Home Loan Mortgage Corporation. While noting that the developer's intent had been to facilitate financing, the court rejected the amendment as being violative of the overall scheme of development, holding that the mandatory membership nature of an association was a *sine qua non* of a community association that could not be changed without doing violence to the overall development plan and to the rights and interests of all those who had relied upon it. HYATT, *supra* § 5.03, at 168 (*citing Lake Forest Property Owners Ass'n v. Lake Forest, Inc.*, No. CV 85–500229 (Circuit Ct. of Baldwin County, Alabama)).