WESTERN HILLS HARBOR
OWNERS ASSOCIATION,
Appellant,

v.

Todd BAKER, George Joseph, and Wife, Evelyn Joseph, Charles Johnson, Charles Michael Properties, Inc., and Michael Sherman, Appellees.

No. 08-15-00060-CV

Court of Appeals of Texas, El Paso.

March 22, 2017

S. Gary Werley, Law Offices of S. Gary Werley, 1840 Acton Hwy., Ste. 102, Granbury, TX 76049, for Appellees.

J. Kevin Thompson, The Silvera Firm, 17070 Dallas Parkway, Suite 100, Dallas, TX 75248, Darryl J. Silvera, The Silvera

Firm, 5001 Spring Valley Rd., Ste. 1015, Dallas, TX 75244, for Appellant.

Before McClure, C.J., Rodriguez, and Hughes, JJ.

## OPINION

YVONNE T. RODRIGUEZ, Justice

Appellees are property owners in a residential subdivision who claim Western Hills Harbor Homeowners Association has been improperly collecting assessments based on an invalid amendment to the subdivision's original restrictive covenants. The trial court granted summary judgment for the Appellees declaring the amendment void and awarding Appellees damages for the improperly-imposed assessments. The Association appeals contending that a fact issue remains on the amendment's validity and that the trial court therefore erred in granting summary judgment. Finding no error, we affirm.[1]

## BACKGROUND

Appellees (the "Lot Owners") own various lots in the Western Hills Harbor Subdivision, a residential subdivision in Granbury, Texas. The parties agree that the subdivision is governed by a document entitled "Subdivision Restrictions" (the "Declaration") which was filed in the Hood County deed records in June 1969. The Declaration provides for monthly assessments of $1.50 per lot on single-lot owners, and $1 per lot on multiple-lot owners, not to exceed $4 per month. The Declaration states that these assessments were for the construction of "swimming pools, parks, roads and other improvements" in the subdivision, and that those improvements were "for the sole use and benefit of the

members of said Association and their families."

The Lot Owners sued the Association alleging that on October 21, 2013, the Association had filed an amendment to the Declaration, which was purportedly adopted in November 1996, raising the assessments by adding a $15 annual fee for each lot owned in the subdivision, as well as a $120 annual fee for rental properties "per rented house." The Lot Owners sought a declaration that the 1996 Amendment was not properly adopted and was therefore "void and invalid," and further sought damages based on the additional assessments the Association had improperly collected in violation of the original Declaration.

### The Summary Judgment Motions

The Lot Owners filed a motion for partial summary judgment arguing they were entitled to judgment as a matter of law on their claim for declaratory relief. The Lot Owners attached a copy of the subdivision's original Declaration, and pointed out that the Declaration did not provide a method for amending the assessments. The Lot Owners argued that in the absence of any method for amending the assessments, the Association had no authority to adopt the 1996 Amendment and the Amendment was void as a matter of law.

In response, the Association argued that a fact issue existed whether the 1996 Amendment was properly adopted and filed. In particular, the Association argued that the 1996 Amendment was permitted by the Association's amended bylaws, which the Association claims were amended in 1983 to provide a method for changing the amount of the assessments. The Association, however, did not indicate

---

1. This appeal was transferred from the Fort Worth Court of Appeals, and we apply the precedent of that Court to the extent required by Tex. R. App. P. 41.3.

when the *original* bylaws were adopted, did not describe what was contained in the original bylaws, and failed to provide as summary judgment evidence either the original bylaws or the Amended Bylaws. The Association did point out in their response to the summary judgment motion that the 1996 Amendment, a copy of which was attached to the Lot Owners' motion, contained a reference to the Amended Bylaws. In particular, the 1996 Amendment stated that the Association was governed by "certain Bylaws" that were filed in the Hood County Deed records in October 2013, which provided that "[a]ssessments and/or other charges to the membership may be changed by the approval of five members of the Board, plus the approval of 2/3 of the membership present and voting at a regular or special meeting[.]"

The Association attached an affidavit to its response from its current President stating that he was present at the November 1996 "special meeting" at which the 1996 Amendment was adopted, and that "[t]here were five members of the Board present and 2/3 of membership present voted to approve the increase in assessments and charges." In addition, the Association also attached the minutes from the November 1996 meeting, indicating that seven (rather than only five) Board members and 27 homeowners attended the meeting, and a vote was taken to amend the Declaration to raise the assessments by adding on a single payment of $15 annually to both categories of lot owners. For reasons that are not clear from the record, the Board did not prepare its minutes of the November 9, 1996 meeting until almost seventeen years later at a meeting on March 26, 2013, and did not file the minutes with the Hood County Clerk's Office until March 27, 2013. Also, for reasons not clear from the record, the 1996 Amendment was not filed in the deed records until October 21, 2013. Finally, the

Lot Owners also attached a document signed by the Association's "Secretary/Registered Agent," (apparently prepared for purposes of filing the 1996 Amendment with the Hood County Clerk's Office in October 2013) stating that seven board members and 27 homeowners were present at the November 9, 1996 meeting, and that the amendment containing the "changes" to the assessments "passed unanimously."

Following hearing, the trial court granted partial summary judgment in favor of the Lot Owners. In its order, the trial court expressly determined that the 1996 Amendment, as filed in the county deed records, was "null, void and of no effect." The trial court also concluded that the minutes of the November 1996 meeting at which the 1996 Amendment was purportedly adopted, as filed in the county deed records, were also null and void.

The Lot Owners subsequently filed a second motion for summary judgment, in which they argued that because the trial court had determined the 1996 Amendment was void, the assessments that the Association had collected pursuant to that amendment were necessarily improper, and that they were entitled to be reimbursed for those assessments, along with an award of attorney's fees. The motion included affidavits and other documentation from the Lot Owners, setting forth the amounts they believed they had been overcharged. It does not appear from the record that the Association filed a response to that motion.

The trial court entered a final summary judgment in the Lot Owners' favor. In its order, the trial court reiterated its conclusions that the 1996 Amendment and the minutes from the November 1996 meeting were both void, and awarded damages to the Lot Owners for the assessments the

Association had imposed on them pursuant to the 1996 Amendment, together with an award of attorney's fees.[2] This appeal followed.

## DISCUSSION

The Association contends on appeal that the trial court erred in granting summary judgment for the Lot Owners, because fact issues remain regarding whether the 1996 Amendment was validly adopted in accordance with the Amended Bylaws and the Texas Property Code. We disagree.

### Judicial Notice

■ As a preliminary matter, the Association has acknowledged that it did not include a copy of the Amended Bylaws in its response to the Lot Owners' motion for summary judgment, and therefore the Bylaws are not part of the appellate record. The Association asks that we take judicial notice of the copy of the Amended Bylaws contained in the appendix to its brief.

■ We do not typically consider documents included in an appendix to a brief when those documents are not part of the appellate record. *See, e.g., Hogg v. Lynch, Chappell & Alsup, P.C.*, 480 S.W.3d 767, 773 (Tex.App.—El Paso 2015, no pet.) (a document attached to a brief as an exhibit or appendix, but not appearing in the appellate record, cannot be considered on appellate review); *Robb v. Horizon Communities Improvement Ass'n, Inc.*, 417 S.W.3d 585, 589 (Tex.App.—El Paso 2013, no pet.); *see also Nicholson v. XTO Energy, Inc.*, No. 02-16-00045-CV, 2016 WL 6648755, at *1 (Tex.App.—Fort Worth Nov. 10, 2016, no. pet. h.) (not designated for publication) (recognizing that documents are not properly before an appellate

court if they are not part of the appellate record). However, Rule 201 of the Texas Rules of Evidence provides that, at any stage of the proceedings, a court may take judicial notice of an adjudicative fact if that fact is not subject to reasonable dispute because it is generally known within the trial court's territorial jurisdiction or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." TEX. R. EVID. 201(a-d). If the standards set forth in Rule 201 are met, an appellate court may take judicial notice of a fact for the first time on appeal of matters not contained within the appellate record. *See Freedom Communications, Inc. v. Coronado*, 372 S.W.3d 621, 624 (Tex. 2012) (recognizing appellate court's right to take judicial notice of documents pursuant to Rule 201); *Office of Pub. Util. Counsel v. Pub. Util. Comm'n of Tex.*, 878 S.W.2d 598, 600 (Tex. 1994) (although ordinarily constrained to evaluating an appeal solely from the four corners of the record, a "court of appeals has the power to take judicial notice for the first time on appeal" pursuant to Rule 201).

The Association contends that we should take judicial notice of the Amended Bylaws, because they can be accurately and readily determined in accordance with Rule 201 since they were filed with the Hood County Clerk's Office in 2013 and are a matter of public record of which an appellate court may take judicial notice. *See, e.g., City of El Paso v. Fox*, 458 S.W.3d 66, 71-72 (Tex.App.—El Paso 2014, no pet.) (taking judicial notice of minutes from meeting of city council that were available on city's website); *see also Bridgeport Ind. Sch. Dist. v. Williams*, 447 S.W.3d 911, 916 n.4 (Tex.App.—Austin

---

**2.** The trial court later issued a nunc pro tunc order upon the agreed motion of the parties, clarifying that its order was a final judgment disposing of all existing claims, all existing parties, and all existing causes of action, thereby rendering the judgment final for appellate purposes.

2014, no pet.) (taking judicial notice of undisputed facts contained in a letter from the Texas Education Agency because those facts impacted the court's jurisdictional inquiry). The Association has included certified copies of the Amended Bylaws in its appendix, together with information indicating that the Amended Bylaws were properly filed in the Hood County Clerk's Office on October 8, 2013. The Lot Owners have not disputed that the Amended Bylaws were filed in the Hood County Clerk's Office, and they also do not dispute the genuine nature of the copies provided by the Association. The Lot Owners also have not opposed the Association's request that we take judicial notice. Instead, the only disagreement with regard to the Amended Bylaws is whether those bylaws were properly adopted and are enforceable. In light of these considerations, we deem it appropriate to, and do, take judicial notice of the Amended Bylaws and that they were filed in the Hood County Deed Records in 2013.

## Standard of Review

An appellate court reviews a summary judgment under well-established rules. *Dyegard Land P'ship v. Hoover*, 39 S.W.3d 300, 306 (Tex.App.—Fort Worth 2001, no pet.). The party moving for summary judgment has the burden of demonstrating that no genuine issue of material fact exists and that he is entitled to judgment as a matter of law. *Id.*; Tex. R. Civ. P. 166a(c); *see Calvillo v. Gonzalez*, 922 S.W.2d 928, 929 (Tex. 1996); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979). A plaintiff moving for summary judgment must prove entitlement to summary judgment on each element of his cause of action. *Dyegard Land P'ship*, 39 S.W.3d at 306. Once the movant has established a right to summary judgment, the burden shifts to the nonmovant to respond and present any

issues that would preclude summary judgment in favor of the movant. *Id.*

We review a trial court's order granting summary judgment *de novo*. *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 79 (Tex. 2015). In conducting our review, we view the evidence in the light most favorable to the nonmovant, indulging all reasonable inferences in the nonmovant's favor and resolving all doubts against the movant. *Dyegard Land P'ship*, 39 S.W.3d at 306. We affirm the summary judgment only if the record establishes that the movant has conclusively established all essential elements of its cause of action as a matter of law. *Id.*

## Interpretation of Restrictive Covenants

 A declaration containing restrictive covenants in a subdivision defines the rights and obligations of property ownership, and the mutual and reciprocal obligation undertaken by all purchasers in a subdivision "creates an inherent property interest possessed by each purchaser." *Inwood N. Homeowners' Ass'n, Inc. v. Harris*, 736 S.W.2d 632, 636 (Tex. 1987); *see also Uptegraph v. Sandalwood Civic Club*, 312 S.W.3d 918, 925 (Tex.App.—Houston [1st Dist.] 2010, no pet.) (a subdivision's deed restrictions are considered to be "restrictive covenants concerning real property"). Restrictive covenants are subject to the general rules of contract construction. *Uptegraph*, 312 S.W.3d at 925 (citing *Pilarcik v. Emmons*, 966 S.W.2d 474, 478 (Tex. 1998)); *see also Dyegard Land P'ship*, 39 S.W.3d at 308. Section 202.003 of Texas Property Code expressly states that a "restrictive covenant shall be liberally construed to give effect to its purposes and intent." Tex. Prop. Code Ann. § 202.003(a) (West 2014); *see also Buckner v. Lakes of Somerset Homeowners Ass'n, Inc.*, 133 S.W.3d 294, 297 (Tex.App.—Fort Worth 2004, pet. denied). Therefore, in

construing a restrictive covenant, the court's primary task is to determine the intent of its framers. *See Dyegard Land P'ship*, 39 S.W.3d at 308; *see also Sanchez v. Southampton Civic Club, Inc.*, 367 S.W.3d 429, 434 (Tex.App.—Houston [14th Dist.] 2012, no pet.). In determining that intent, we examine the covenant as a whole in light of the circumstances present when the parties initially entered into the covenant. *Pilarcik*, 966 S.W.2d at 478. We review a trial court's interpretation of a restrictive covenant *de novo*. *Uptegraph*, 312 S.W.3d at 925.

### The Association's Burden of Proof

■ When a property owner seeks a declaratory judgment to determine their rights under a subdivision's original restrictive covenants, and an association interposes the defense that the original covenants were amended, the association bears the burden to establish the "validity and enforceability of the amended covenants" and is required to come forward with "evidence to establish both its right to amend and its compliance with the legal steps to amend the covenants[.]" *See Dyegard Land P'ship*, 39 S.W.3d at 308; *see also City of Pasadena v. Gennedy*, 125 S.W.3d 687, 697-98 (Tex.App.—Houston [1st Dist.] 2003, pet. denied) (party attempting to rely on amendment to restrictive covenants had the burden to demonstrate that the deed restrictions were validly amended).

In the present case, the Lot Owners moved for summary judgment on the ground the Declaration provided the controlling contractual terms between the parties, and that it did not allow for an increase in the assessments to be imposed because it did not contain any procedure for amending the covenants to allow for such an increase. In response, the Association argued that the Declaration had been properly amended in 1996 to allow for the increase. Because the Association was relying on this 1996 Amendment to avoid summary judgment, it had the burden to come forward with evidence to establish that the amendment was properly and validly made. We conclude that the Association did not meet this burden.

### The Declaration Did Not Contain an Amendment Procedure

■ In general, the original landowner of a subdivision, normally the developer, has the unilateral or "ex parte" right in the first instance to impose any restrictions it chooses, to alter or cancel restrictions, or to abrogate them in their entirety, so long as no lots in a subdivision have been sold. *See Dyegard Land P'ship*, 39 S.W.3d at 313; *Parker v. Delcoure*, 455 S.W.2d 339, 343 (Tex.Civ.App.—Fort Worth 1970, writ ref'd n.r.e.). After any of the subdivision's lots has been sold, the developer's power to amend the deed restrictions may nonetheless continue, but only if the dedicating instrument (*i.e.*, the instrument creating the original restrictions) establishes both the right to amend the restrictions and a method of doing so. *Dyegard Land P'ship*, 39 S.W.3d at 313; *see also Cedar Oak Mesa, Inc. v. Alternate Real Estate, LLC*, No. 03-10-00067-CV, 2010 WL 3431703, at *5 (Tex.App.—Austin Aug. 31, 2010, no pet.).

■ In the present case, the developer's original Declaration, which contains the original restrictive covenants governing the subdivision, did not provide either the right to amend or a method for doing so, and the Association appears to acknowledge as much. Instead of relying on the Declaration, the Association contends the right to amend and the method for doing so can be found in the subdivision's Amended Bylaws, and it further contends the Amended Bylaws should be considered

part of the subdivision's "dedicatory instrument."[3] We disagree.

The Association's argument that the Amended Bylaws should be considered part of the subdivision's "dedicatory instrument," is based almost exclusively on the fact that the Association filed the Amended Bylaws in the county deed records, albeit almost 20 years after they were purportedly adopted, apparently believing that this filing was all that was required to demonstrate their validity. In support of its argument, the Association relies on *Goddard v. Northhampton Homeowners Assoc., Inc.*, 229 S.W.3d 353 (Tex.App.—Amarillo 2007, no pet.), claiming that *Goddard* involves an "identical fact pattern" to the present case. *Goddard*, however, is inapposite to the present case.

In *Goddard*, the developer of a residential subdivision filed both the "Declaration of Covenants" and "By-laws" in the county's deed records when the subdivision was first developed. *Id.* at 354. The original restrictive covenants in that case provided for assessments to be imposed on the homeowners for a specified period of time, and further provided a method for altering the assessments during that specific period of time, but not afterwards. *Id.* However, the court noted that the bylaws gave the association's board of directors the right to "establish, levy, assess and collect the assessments," and concluded that it thereby provided a method for the board to increase the assessments after that time. *Id.* at 358. In reaching this conclusion, the court found it appropriate to consider both the declaration and the bylaws collectively as constituting the subdivision's dedicatory instrument because both documents were contemporaneously filed in the county deed records, and the developer intended for the two documents to be considered together as part of an "overall scheme" to ensure that the subdivision's homeowners association could continue to function as a "fully operative" and "viable" association. *Id.* at 357.

In contrast, the Association here has not provided a copy of any original bylaws that allegedly were adopted or filed at or near the same time the Declaration was adopted, which could be considered as part of an "overall scheme" by which the subdivision was to be governed. Nor has the Association asserted that any such contemporaneous original bylaws exist. Further, the Declaration itself does not indicate that the subdivision was to be governed by any bylaws, and the Association has presented no evidence to support any conclusion that the subdivision's developer intended for

---

**3.** A "dedicatory instrument" is defined by statute as "each governing instrument covering the establishment, maintenance, and operation of a residential subdivision." TEX. PROP. CODE ANN. § 209.002(4) (West Supp. 2016). "The term includes restrictions or similar instruments subjecting property to restrictive covenants, bylaws, or similar instruments governing the administration or operation of a property owners' association, to properly adopted rules and regulations of the property owners' association, and to all lawful amendments to the covenants, bylaws, rules, or regulations[.]" *Id.*; *see also* TEX. PROP. CODE ANN. § 202.001(4) (West 2014) (defining "restrictive covenant" as "any covenant, condition, or restriction contained in a dedicatory instrument, whether mandatory, prohibitive, permissive, or administrative"). In addition, a dedicatory instrument includes "all lawful amendments to the covenants, bylaws, instruments, rules, or regulations." TEX. PROP. CODE ANN. § 202.001(1)(C) (West 2014). The Lot Owners appear to believe that a lawful amendment cannot be considered part of the dedicatory instrument if it was adopted or filed after the first lot in the subdivision was sold. Section 202.001(1)(C) provides otherwise, however, and allows properly-adopted amendments to be considered as part of the dedicatory instrument. In any event, the key question in this appeal is whether the 1996 Amendment was properly adopted.

the subdivision to be governed by any such bylaws. Instead, the Association relies solely on the Amended Bylaws, which state that the subdivision's "bylaws" were first amended in 1982, and later in 1983. Yet the Association makes no effort to explain the authority by which *any* of the subdivision's bylaws were purportedly adopted, or the manner in which any such adoptions took place. Finally, although the Amended Bylaws indicate that the 1983 version of the Bylaws was amended in accordance with "Article VII, Section I, of By-Laws as amended in 1982, and became effective on the day after passage by the Membership (October 16, 1983)[,]" the Association did not present either the original bylaws or the 1982 version of the bylaws as summary judgment evidence, and has failed to explain what authority the Association had to adopt or amend the bylaws in the first instance.

We therefore conclude that the Association failed to carry its burden of establishing that the Amended Bylaws were properly adopted or that they were intended to be part of the subdivision's dedicatory instrument. *See Cedar Oak Mesa, Inc.*, 2010 WL 3431703, at *4-5 (residential homeowner's association failed to carry its burden of demonstrating the enforceability of amended bylaws, where it failed to provide the court with a copy of the "original" bylaws and further failed to establish that those bylaws were properly adopted in accordance with the subdivision's original restrictive covenants). Accordingly, because the Declaration itself did not include an amendment procedure, we conclude that the 1996 Amendment was not properly adopted in accordance with the subdivision's governing documents.

However, even when a residential subdivision's governing documents do not provide a method for amending its original restrictive covenants, the subdivision may utilize the alternative statutory method for doing so as provided in Chapter 209 of the Texas Property Code. We next consider the applicability of Chapter 209.[4]

### Applicability of Chapter 209 of the Property Code

Chapter 209 of the Texas Property Code applies to residential subdivisions that are governed by declarations that authorize a homeowners' association to collect regular or special assessments on all or a majority of the property in the subdivision. *See* TEX. PROP. CODE ANN. § 209.003(a) (West Supp. 2016). It further provides that a residential subdivision requiring "mandatory" membership of its property owners in such a homeowners association may amend its restrictive covenants upon a "67 percent of the total votes allocated to property owners entitled to vote on the amendment of the declaration, in addition to any governmental approval required by law." TEX. PROP. CODE ANN. § 209.0041(h) (West Supp.

---

4. The Association argues at length that the trial court improperly applied Chapter 211 of the Texas Property Code to invalidate the 1996 Amendment. In particular, the Association points out that Chapter 211, which provides a subdivision that has restrictive covenants lacking an amendment procedure with a method for adopting such a procedure, applies only to certain residential subdivisions that are located in counties of a certain size or in certain geographical areas in the State, and contends that the subdivision does not fit within the criteria set forth in the statute. TEX. PROP. CODE ANN. §§ 211.002(b)(1) (West Supp. 2016); 211.004 (West 2014). The trial court, however, never expressly applied Chapter 211 to the present case, and moreover, as the Association points out, the Lot Owners do not argue that Chapter 211 applies and instead focus their attention on the applicability of Chapter 209. Because the trial court did not expressly apply Chapter 211 and the Lot Owners did not argue that it applies, we need not address the Association's argument on this point.

2016). The Code also provides for an exception when the declaration itself "contains a lower percentage" than prescribed, in which case the "declaration controls." TEX. PROP. CODE ANN. § 209.0041(h-1) (West Supp. 2016). Nevertheless, if the subdivision's declaration is "silent as to voting rights for an amendment," the Code provides that the declaration may be amended only by a vote of owners "owning 67 percent of the lots subject to the declaration." [5] TEX. PROP. CODE ANN. § 209.0041(h-2) (West Supp. 2016).

The parties debate over whether membership in the Association is mandatory in order to render Chapter 209 applicable, and if so, whether the 1996 Amendment otherwise complied with the requirements of that Chapter. We conclude that membership in the Association is mandatory, but that the Association failed to establish that the 1996 Amendment was properly adopted in accordance with the requirements of Chapter 209.

### The Declaration Makes Membership in the Association Mandatory

 In its summary judgment order, the trial court expressly determined that the subdivision's restrictive covenants did not require mandatory membership in the Association by the subdivision's lot owners. We disagree with this conclusion.

As the Supreme Court has recognized, the very heart of a mandatory-membership homeowners association, as opposed to a voluntary one, is the association's right to require that all property owners pay assessment fees, and the property owner's corresponding right to demand that maximum services be provided within the association's budget, both of which are considered "inherent property right[s]." *Inwood N. Homeowners' Ass'n, Inc.*, 736 S.W.2d at 636; *Pooser v. Lovett Square Townhomes Owners' Ass'n*, 702 S.W.2d 226, 231 (Tex. App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.); *see also Scoville v. SpringPark Homeowner's Ass'n, Inc.*, 784 S.W.2d 498, 506 (Tex.App.—Dallas 1990, writ denied) (dissent, Ovard, J.) (noting that the key powers held by a mandatory membership homeowner's association is the power to "levy and collect assessments" on the property owners and to impose a lien for a property owner's failure to pay those assessments). Although the Lot Owners correctly point out that the Declaration does not expressly state that membership in the Association is mandatory, the Declaration nevertheless imposes *mandatory* assessments on all lot owners, giving the owners no choice but to pay those assessments.[6] Further, the Declaration provides that those assessments are for the construction of "swimming pools, parks, roads and other improvements" in the subdivision, which were to be utilized solely by "members" of the Association and their families. From this language, we conclude that the subdivision developer made clear its intent to create a mandatory-membership association for the benefit of its members, as opposed to one that was simply voluntary.

---

**5.** This Code provision expressly states that it is to be applied retroactively to subdivisions created before its effective date, and that it controls over other sections in the Code. TEX. PROP. CODE ANN. § 209.0041(e)(g) (West Supp. 2016). The parties do not contest the propriety of applying this Code provision retroactively.

**6.** The Association primarily points to the provisions in the Amended Bylaws in support of its argument that Association membership is mandatory. As explained above, however, in the absence of any evidence that the Amended Bylaws were properly and validly adopted, we decline to consider them in our analysis, and instead consider only the terms of the Declaration itself in determining whether membership in the Association is mandatory.

The Lot Owners, however, find it significant that the Declaration states that if a property owner makes application to be included in the Association, but is "refused" such membership or is otherwise "expelled from membership," the assessments do not accrue with respect to that particular lot during any period of non-membership.[7] The Lot Owners contend this gives the Association the discretion to refuse membership to a particular lot owner and to expel the lot owner from membership, and that therefore membership cannot be considered mandatory. This position is incorrect. The fact that a subdivision's declaration gives a homeowner's association the discretion to refuse membership to a property owner or to expel an owner from membership in accordance with its internal rules and regulations, does not render membership in the Association any less mandatory, where an individual purchasing property within the subdivision otherwise agrees to pay those assessments in accordance with the subdivision's restrictive covenants. *See, e.g., Lawry v. Pecan Plantation Owners Ass'n, Inc.*, No. 02-15-00079-CV, 2016 WL 4395777, at *4 (Tex.App.—Fort Worth Aug. 18, 2016, no pet.) (not designated for publication) (membership in residential homeowners' association was mandatory for purposes of applying Section 209.0041, despite that the association's governing documents conditioned membership on the property owner's "observance of the rules and regulations established by the Association," and on the payment of all dues, fees, and charges that the association imposed on the property owners for the maintenance of the association's facilities

and services); *see also Scoville*, 784 S.W.2d at 506 (dissent Ovard, J.) (that membership in an association may be limited or denied by an association or is otherwise subject to the association's internal rules and regulations does not render the membership any less mandatory, where the developer's declaration requires all lot owners to pay assessments to the association, as a means of binding each owner to all other owners to effectuate the purposes of the association).

We therefore conclude that, despite the Association's discretion to exclude or expel certain property owners from membership, the subdivision was intended to be developed as a mandatory-membership Association, and therefore, Chapter 209 of the Property Code is applicable to the subdivision.

### The Vote for the 1996 Amendment

■ Section 209.0041 provides two methods for a residential subdivision to amend its original declaration. First, "[i]f the declaration is silent as to voting rights for an amendment, the declaration may be amended by a vote of owners owning 67 percent of the lots subject to the declaration." Tex. Prop. Code Ann. § 209.0041(h-2) (West Supp. 2016). Second, if the declaration contains a lower percentage than the 67 percent called for in that section, the "percentage in the declaration controls." Tex. Prop. Code Ann. § 209.0041 (h-1).

In arguing for the application of the second alternative, the Association once again relies exclusively on the Amended Bylaws, which it notes allow for a "lower percentage" of the membership to vote on

---

**7.** The Declaration states that the assessments "shall not accrue in respect to any lot during such time as the owner ... after having made written application for membership in [the Association] is refused membership (or having been admitted is involuntarily expelled from

membership) in said Association, it being understood that said swimming pool, park and recreational area are for the sole use and benefit of the members of said Association and their families."

an amendment, or in other words, "2/3 of the membership present and voting at a regular or special meeting." This argument fails, however, because the Association failed to meet its burden of establishing that the Amended Bylaws were properly adopted or that these bylaws could be considered part of the subdivision's properly-adopted "declaration" for purposes of Chapter 209.

Accordingly, because the Declaration was silent as to the "voting rights for an amendment," the Association's only hope for establishing the validity of the 1996 Amendment was to demonstrate that the 1996 Amendment was adopted by a "vote of owners owning 67 percent of the lots subject to the declaration." TEX. PROP. CODE ANN. § 209.0041(h-2). The Association, however, does not contend that the 1996 Amendment was adopted with a 67 percent vote, and in fact, the only evidence presented to the trial court established that, at best, the amendment was adopted upon a 2/3's vote of the property owners, or in other words, only 66.6 percent of the property owners. Accordingly, we conclude that the Association failed to present evidence to support any conclusion that the vote to adopt the 1996 Amendment was in accordance with the 67 percent requirement set forth in the Code.

In the absence of any evidence that the 1996 Amendment, which raised the assessments on the Lot Owners, was validly adopted or otherwise binding on the property owners, we conclude that the trial court properly granted summary judgment for the Lot Owners. *See, e.g., Dyegard Land P'ship*, 39 S.W.3d at 308 (upholding trial court's grant of summary judgment in plaintiff property owner's favor, where defendant subdivision developer failed to establish that it validly amended the subdivision's original covenants to prohibit property owners from drilling wells for water). We therefore overrule the Association's issue on appeal.

## CONCLUSION

We affirm the trial court's judgment.

Hughes, J., not participating