

# NUMBER 13-24-00051-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

SWAN POINT LANDING
COMMUNITY ASSOCIATION, INC.
AND SWAN POINT LANDING, LLC,                    Appellants,

v.

CHRISTOPHER T. MARTIN, CHRIS
AND DEB MARTIN RENTAL, LLC,
336 BAYSIDE DRIVE, LLC, 387
BAYSIDE DRIVE, LLC, AND 553
BAYSIDE DRIVE, LLC,                             Appellees.

## ON APPEAL FROM THE 24TH DISTRICT COURT
## OF CALHOUN COUNTY, TEXAS

# OPINION

**Before Chief Justice Tijerina and Justices Silva and West**
**Opinion by Justice West[1]**

Appellants Swan Point Landing Community Association, Inc. (the Association) and Swan Point Landing, LLC, (the Declarant) (collectively "Swan Point") challenge the trial court's grant of summary judgment in favor of appellees Christopher T. Martin, Chris and Deb Martin Rental, LLC, 336 Bayside Drive, LLC, 387 Bayside Drive, LLC, and 553 Bayside Drive, LLC (collectively the Martins). The Martins filed suit against Swan Point challenging amendments to the Association's "Declaration of Covenants, Conditions and Restrictions." Swan Point countersued for, among other claims, breach of the declaration's new restrictive covenants and lien foreclosure on a $695,000 special assessment levied under the new rate established by one of the amendments. Both parties filed a traditional motion for summary judgment, largely arguing about whether the amendments as a matter of law were enforceable against the Martins.

Swan Point argues that the trial court erred when it granted the Martins' motion for summary judgment, denied its motion, and granted attorney's fees for the Martins. Finding that two of the amendments at issue are enforceable against the Martins, we affirm in part, reverse and render in part, and reverse and remand in part.

---

[1] This matter was originally submitted at oral argument before a panel which consisted of the Honorable Dori Contreras, the Honorable Gina M. Benavides, and Justice Clarissa Silva; however, the Honorable Dori Contreras and Honorable Gina Benavides did not participate in this opinion because their terms of office expired on December 31, 2024.

## I.    BACKGROUND

### A.    The Subdivision's Beginnings and Original Declaration of Covenants

In 2003, David Eller, the original developer and president of Swan Point Landing, LLC,[2] platted the Swan Point Landing subdivision into ninety residential lots off a coastal bay in Calhoun County. Eller filed a declaration containing reciprocal restrictive covenants in the local real property records. The 2003 Declarations contained various use restrictions. Relevant here, the declarations restricted the lots for "residential use only" and provided that only "one single family residence and its approved outbuildings" could be constructed on the lots. The declarations further prohibited lots from "business, professional, commercial or manufacturing use" and "[t]he use of any [l]ot for duplex houses, garage apartments for rental purposes, apartment houses or mobile homes."

The 2003 Declarations authorized the Association to levy annual assessments and special assessments on the lots "for the purpose of defraying, in whole or in part, the cost of any construction, reconstruction, repair or replacement of a capital improvement upon the Common Area," including the "private streets" within the subdivision. Special assessments were to "be approved by a two-thirds (2/3rds) vote" of the members of the association. Both annual and special assessments were "fixed at uniform rates, and all Lots in the Properties" bore the costs of the assessments equally, except lots owned by the Declarant, which were to "be assessed at 25% of the assessment that would be owed on a Lot owned by an Owner." Unpaid assessments were susceptible to lien foreclosure against the property.

---

[2] Eller originally created "Swan Point Landing, Ltd.," but the entity was dissolved in 2009 and succeeded by appellant Swan Point, LLC.

3

A general amendment clause provided that the declarations could "be amended at any time when an instrument setting forth said changes and signed by those persons holding two-thirds (2/3) of votes in the Association is placed on record in the real property records of Calhoun County, Texas." Lot owners, designated as "Class A Members" of the Association, were granted one vote per lot owned. The Declarant, the "Class B Member," was granted four votes for each lot that it owned during the "Development Period."[3] The Development Period was set to expire on December 31, 2013, or until "total votes outstanding in Class A membership equal[ed] or exceed[ed] the total votes outstanding in Class B membership," or at an earlier date "as may be established by [the] Declarant in a written instrument recorded" in the county records, whichever occurred earlier. In other words, the Declarant had four times the voting power of a regular lot owner until December 31, 2013, at the latest.

## B.     The 2006, 2012, and 2018 Declarations

The Declarant, using its weighted voting power, amended the declarations in 2006. The 2006 Declarations designated seven of the lots as "commercial lots" for the "purpose of lodging paying guests and operating a business for chartering fishing, hunting and other tours for such guests." Relevant to this case, the 2006 Declarations (1) gave the Declarant the power "to act as and constitute the [Association's] Board of Directors during the Development Period," (2) set annual assessments at $850 for residential lots and $1,075 for commercial lots, with neither to increase more than 10% annually and allowing the Association's Board of Directors to adjust the figure "provided that such assessment

---

[3] The 2003 Declarations label this as the "Conversion Date" but later amendments call this period the "Development Period." We will refer to this as the Development Period for clarity and consistency.

be uniform," (3) changed the percentage of annual and special assessments attributable to the Declarant's lots from twenty-five percent to "fifty percent (50%)," and (4) prohibited the Declarant from voting on special assessments. The use restrictions on residential lots generally remained the same.

On March 9, 2006, just days after the subdivision's declarations were recorded, the Martins purchased two contiguous commercial lots. The Martins opened the Bay Flats Lodge in 2007, "a full-service facility that houses guests and provides for various hunting and fishing excursions." The Martins went on to purchase four residential lots in 2009, 2013, 2017, and 2018, three of which they rent out for terms of less than 30 days, or to persons who visit the Bay Flats Lodge, or both.

Using its weighted voting power, the Declarant amended the declarations in 2012 to extend the Development Period until the end of 2018, and again in 2018 to extend the Development Period until the end of 2023.

C.      Deteriorating Roads and the 2019 Declarations

It is undisputed that the streets in the subdivision are in disrepair. In 2018, the Association "received a project bid for $110,500 from Lester Contracting for limited repairs to the Swan Point Landing roads." According to the Association, the bid "did not address the underlying deterioration of the subdivision's roads."

Using its weighted voting power vested by the 2018 Declarations, the Declarant amended the declarations in 2019 to alter the uniform rate in which special assessments are collected. The new rate was "based upon the percentage of" an individual lot owner's "contribution to the condition being remedied by the Special Assessment," which was to

5

be determined by the Board "in good faith." The 2019 Declarations also deleted the provision prohibiting the Declarant from voting on special assessments.

## D.    Current Litigation and the 2022 Declarations

In 2020, the Association hired an engineering firm to assess the roads in the subdivision and solicit bids. The engineering firm "conducted a geotechnical study" and recommended that the bid be awarded to a construction company at a cost of $879,600. At the request of the Association, the engineering firm conducted a study and determined that 79% of the traffic in the subdivision was attributable to the Bay Flats Lodge. On April 23, 2021, the Board determined that 79% of the special assessment should be apportioned to the commercial use within the subdivision, 15.33% apportioned to the residential use within the subdivision, and 5.67% apportioned to other marina traffic. At the same meeting, the Board voted to end leasing on residential lots for periods of thirty days or less. The Association then levied a special assessment against the Martins in the amount of $694,931.40, representing 79% of the bid.

The Martins sued Swan Point. The Martins alleged, among other things, that Swan Point violated the open meeting protocols under § 209.0051 of the Texas Property Code when it passed the amendments from 2012 to 2021.[4] At this time, the Declarant still owned fifty-three of the ninety lots in the subdivision. In response to the Martins' claim,

---

[4] Under Chapter 209 of the Texas Property Code, the board of a property owners' association must conduct business at a meeting open to all members "subject to the right of the board to adjourn a board meeting and reconvene in closed executive session." TEX. PROP. CODE ANN. § 209.0051(c). Members must be given notice of the meetings, including advance "notice of the date, hour, place, and general subject of a regular or special board meeting." *See id.* § 209.0051(e). The open meetings statute was passed by the Texas Legislature in 2011 and was effective January 1, 2012. Meetings, Elections, and Records of Certain Property Owners' Associations, 82nd Leg., R.S., ch. 1026, § 3, sec. 209.0051, 2011 Tex. Gen. Laws 2603, 2606 (codified at TEX. PROP. CODE ANN. § 209.0051). Thus, the Martins contended that amendments passed in 2012 and beyond violated § 209.0051.

the Declarant and about twenty lot owners voted and passed seven measures that amended the declaration of covenants and the Association's bylaws. The amended declarations essentially codified all the amendments passed by the Declarant after 2006. The declarations were recorded in the real property records of Calhoun County on June 15, 2022.

In their lawsuit, the Martins asserted multiple claims against Swan Point, including breach of restrictive covenant and suit to quiet title. They sought declarations that the restrictive covenants from 2012 to 2022 were unenforceable and a permanent injunction enjoining Swan Point from implementing the "special assessment allocation scheme" from the 2022 Declarations and "from incorrectly weighting the Declarant's votes as 4x other owners' votes." Swan Point countersued the Martins for breach of the new restrictive covenants, unjust enrichment, negligence, and lien foreclosure on the approximately $695,000 special assessment levied under the new rate.

The parties filed cross motions for summary judgment. The Martins' sought traditional summary judgment on their claims for: (1) declaratory relief that the amendments to the 2006 Declarations were unenforceable, (2) breach of restrictive covenants and injunctive relief enjoining the Association from collecting the special assessment, (3) quiet title, and (4) "unconstitutional voidness of restrictive covenants." They also asserted that the Association's counterclaims for breach of restrictive covenant, unjust enrichment, and lien foreclosure "should be dismissed in light of the grant of summary judgment to [the Martins] on their affirmative claims." Swan Point sought traditional summary judgment on the enforceability of the 2022 Declarations.

7

On December 15, 2023, the trial court granted the Martins' requested declaratory relief. "Related to and consistent with the foregoing declaratory relief," the trial court granted the Martins' claims for (1) breach of restrictive covenant and permanently enjoined the Association "from assessing [the Martins] more than assessments dictated and allowed by the 2006 restrictive covenants," and (2) quiet title. It denied Swan Point's traditional motion for summary judgment. The trial court's order concluded that "[a]ll remaining claims of the parties are reserved for further proceedings and trial."[5]

In its "Order and Final Judgment," following the parties' motions for attorney's fees, the trial court awarded the Martins $59,040 in attorney's fees and dismissed with prejudice Swan Point's "collections-type counterclaims for breach of restrictive covenant, unjust enrichment, and lien foreclosure." This appeal followed.

## II.   ENFORCEABILITY OF THE DECLARATION OF COVENANT'S 2022 AMENDMENTS

Swan Point contends that the trial court erred when it granted the Martins' motion for summary judgment and denied its motion for summary judgment on the enforceability of the 2022 amendments.[6] It argues that the 2022 amendments are enforceable as a matter of law against the Martins.

---

[5] The Martins' live petition included claims for (1) declaratory relief that the assessment by the Association "is arbitrary, capricious, or discriminatory within the meaning of Texas Property Code [§] 202.004(a)," (2) statutory fraud, and (3) violations of the Texas Deceptive Trade Practices Act (DTPA). The Martins' claims for statutory fraud and violations of the DTPA and the Association's negligence counterclaim were severed into another cause number and abated.

[6] The trial court granted "declaratory relief that the restrictive covenants recorded . . . after 2006" could not be enforced against the Martins. The 2022 amendments codify all of the amendments passed after 2006. Thus, we will analyze the enforceability of the 2022 amendments.

8

## A. Standard of Review and Applicable Law

"A trial court's ruling on a motion for summary judgment is reviewed de novo." *Tarr v. Timberwood Park Owners Ass'n*, 556 S.W.3d 274, 278 (Tex. 2018). To prevail on a traditional motion for summary judgment, the movant must establish that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *ConocoPhillips Co. v. Koopmann*, 547 S.W.3d 858, 865 (Tex. 2018). When, as here, both parties move for summary judgment, each party bears the burden of establishing that it is entitled to judgment as a matter of law. *Tarr*, 556 S.W.3d at 278. If the trial court grants one motion and denies the other, we should review both sides' summary judgment evidence, determine all questions presented, and render the judgment that the trial court should have rendered. *Id.*; *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000).

Likewise, construction of a restrictive covenant is a question of law, and we review the trial court's construction de novo. *Tarr*, 556 S.W.3d at 279. Under Texas law, three conditions must be met "for a subsequent instrument to amend the original restrictive covenants governing a subdivision." *Hanchett v. E. Sunnyside Civic League*, 696 S.W.2d 613, 615 (Tex. App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.).

> First, the instrument creating the original restrictions must establish both the right to amend such restrictions and the method of amendment. Second, the right to amend such restrictions implies only those changes contemplating a correction, improvement, or reformation of the agreement rather than a complete destruction of it. Third, the amendment to the restrictions may not be illegal or against public policy.

*Id.* (internal footnotes omitted); *see, e.g.*, *Cauthorn v. Pirates Prop. Owners' Ass'n*, 679 S.W.3d 876, 879 (Tex. App.—Houston [1st Dist.] 2023, pet. denied) (applying the three-

9

conditions test to determine whether an amendment to a subdivision's deed restrictions was enforceable against the dissenting property owner); *Chu v. Windermere Lakes Homeowners Ass'n*, 652 S.W.3d 899, 902–03 (Tex. App.—Houston [14th Dist.] 2022, pet. denied) (same); *Wilchester W. Concerned Homeowners LDEF, Inc. v. Wilchester W. Fund, Inc.*, 177 S.W.3d 552, 562 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (same); *see also BLF LLC v. Landing at Blanco Prop. Owners Ass'n*, No. 03-22-00423-CV, 2023 WL 8607028, at *6 (Tex. App.—Austin Dec. 13, 2023, pet. denied) (mem. op.) (same); *Adlong v. Twins Shores Prop. Owners Ass'n*, No. 09-21-00166-CV, 2022 WL 869801, at *9 (Tex. App.—Beaumont Mar. 24, 2022, pet. denied) (mem. op.) (same).[7]

As to the second condition, amendments that substantially change the original or pre-amended deed restrictions do not "destroy" the restrictions. *See, e.g.*, *Couch v. S. Methodist Univ.*, 10 S.W.2d 973, 973–74 (Tex. [Comm'n Op.] 1928) (upholding "radical" amendments to deed restrictions which allowed "the erection of business homes" and essentially "change[d] . . . the particular block or blocks involved from a reserved residential district"); *Sunday Canyon Prop. Owners Ass'n v. Annett*, 978 S.W.2d 654, 656, 658 (Tex. App.—Amarillo 1998, no pet.) (upholding multiple amendments to the deed restrictions of a residential subdivision, which included the creation of a property owners association with the power "to levy charges and assessments against the lots"). Rather,

---

[7] The Martins argue that the three-conditions test does not apply to this case because the facts here differ from *Couch v. Southern Methodist University*, the case in which these conditions originated. *See* 10 S.W.2d 973, 974 (Tex. [Comm'n Op.] 1928). They argue that the amendments in *Couch* removed restrictions on land use while the amendments here impose new use restrictions. However, Texas courts have long upheld amendments that impose greater restrictions to a subdivision's declaration of covenants. *See Cauthorn v. Pirates Prop. Owners' Ass'n*, 679 S.W.3d 876, 879, 882 (Tex. App.—Houston [1st Dist.] 2023, pet. denied); *Sunday Canyon Prop. Owners Ass'n v. Annett*, 978 S.W.2d 654, 657–58 (Tex. App.—Amarillo 1998); *see also Poole Point Subdivision Homeowners' Ass'n v. DeGon*, No. 03-20-00618-CV, 2022 WL 869809, at *4 (Tex. App.—Austin Mar. 24, 2022, pet. denied) (mem. op.).

10

the second condition focuses on whether the amendment destroys the deed restrictions as a whole, not whether individual restrictions or covenants are destroyed. *See Couch*, 10 S.W.2d at 974; *Cauthorn*, 679 S.W.3d at 879 (stating that the second condition considers whether modification or amendment destroys "the agreement" or original deed restrictions); *Sunday Canyon*, 978 S.W.2d at 658 (holding that substantial amendments to a subdivision's deed restrictions "did not destroy the dedication, but made changes in exact accordance with it to further the purpose of the restrictions" (citing *Couch*, 10 S.W.2d at 974)); *Baldwin v. Barbon Corp.*, 773 S.W.2d 681, 686 (Tex. App.—San Antonio 1989, writ denied) ("*Couch* indicated that even where amendments completely destroyed restrictions, if the power to do so was recorded in the deed, the agreement was not to be considered destroyed." (citing *Couch*, 10 S.W.2d at 974)).

In analyzing the third condition, our primary inquiry is whether the amendment furthers, or is consistent with, the pre-amended restrictions or overall plan or scheme of the subdivision's development.[8] *See Cauthorn*, 679 S.W.3d at 881; *Sunday Canyon*, 978 S.W.2d at 658; *Harrison v. Air Park Ests. Zoning Comm.*, 533 S.W.2d 108, 111 (Tex. App.—Dallas 1976, no writ) (holding that the amendment at issue was not illegal and did not violate public policy because it was "reasonable and compatible with the purpose of the development"); *see also Angelwylde HOA, Inc. v. Fournier*, No. 03-21-00269-CV,

---

[8] Some cases seem to conflate conditions two and three and hold that if the amendment at issue is consistent with the purpose of the development or existing restrictions, they fulfill one or the other or both. *See Cauthorn*, 679 S.W.3d at 881–82 (holding that the amendment at issue aligned with the purpose of the original restrictions and therefore satisfied the second and third conditions); *see also BLF LLC v. Landing at Blanco Prop. Owners Ass'n*, No. 03-22-00423-CV, 2023 WL 8607028, at *5 (Tex. App.—Austin Dec. 13, 2023, pet. denied) (holding that the amendment at issue satisfied the second condition because it did not contradict the "original scheme" or "essential nature" of the development); *Poole Point*, 2022 WL 869809, at *4 (holding that the second and third conditions were met after analyzing whether the amendment was "consistent with the overall plan of development").

11

2023 WL 2542339, at *5 (Tex. App.—Austin Mar. 17, 2023, pet. denied) (mem. op.) (holding that the amendment at issue did not violate public policy in part because it reinforced the existing restrictions); *Poole Point Subdivision Homeowners' Ass'n v. DeGon*, No. 03-20-00618-CV, 2022 WL 869809, at *4 (Tex. App.—Austin Mar. 24, 2022, pet. denied) (mem. op.) ("Modifications to deed restrictions that impose greater restrictions are not prohibited by law when they are consistent with the overall plan of development." (collecting cases in which amendments imposing greater restrictions to property owners were upheld)). However, a restrictive covenant generally does not violate public policy "unless [it] contravenes some positive statute or some well-established rule of law." *See Teal Trading & Dev., LP v. Champee Springs Ranches Prop. Owners Ass'n*, 593 S.W.3d 324, 338 (Tex. 2020) (citation omitted).

## B.    "Reasonable Expectations" Standard

The Martins advocate that we adopt a standard used in other states to determine whether modifications or amendments to deed restrictions are enforceable. Under this test, the question becomes whether the existing landowner could have reasonably expected the amendment, and if not, then the amendment is unenforceable. *See, e.g.*, *Kalway v. Calabria Ranch HOA, LLC*, 506 P.3d 18, 23 (Ariz. 2022) (providing that Arizona common law "prohibits some amendments [to an HOA's declarations of covenants, conditions, and restrictions] even if passed by a majority vote" because "[t]he original declaration must give sufficient notice of the possibility of a future amendment; that is, amendments must be reasonable and foreseeable").

According to the Martins, the "reasonable expectations" test strikes the appropriate balance between the existing landowner's reliance interests at the time of purchase and

the will of the majority landowners. *See Armstrong v. Ledges Homeowners Ass'n, Inc.*, 633 S.E.2d 78, 87 (N.C. 2006) (providing that "the permissible scope" of an amendment to a residential community's declarations of covenants involves "a conflict between the legitimate desire of a homeowners' association to respond to new and unanticipated circumstances and the need to protect minority or dissenting homeowners by preserving the original nature of their bargain"). The Martins contend that the amendments in this case were not foreseeable, and they would never have purchased the lots under the 2022 Declarations had those amendments been imposed.[9]

While "the Supreme Court has noted that restrictive covenants generally will be enforced if they are 'within reasonable bounds,'" Texas courts have not adopted this standard. *Cauthorn*, 679 S.W.3d at 882 (quoting *Tarr*, 556 S.W.3d at 280); *Chu*, 652 S.W.3d at 903–04; *see Wilchester*, 177 S.W.3d at 564 (considering whether amendments were reasonable in the court's analysis of whether the amendments were illegal or violated public policy); *Harrison*, 533 S.W.2d at 111 (same). *But see Holleman v. Mission Trace Homeowners Ass'n*, 556 S.W.2d 632, 635–37 (Tex. App.—San Antonio 1977, no

---

[9] The Martins argue that the 2022 amendments would still be enforceable against new purchasers to the Swan Point subdivision because they seek declaratory relief that the amendments are unenforceable against them, not void in their entirety. They contend that the 2022 amendments could still be enforced against future lot owners because they would be purchasing with notice of the new restrictions.

However, as the Martins note in their appellate brief, they argue that the 2022 amendments are not enforceable against them (rather than "void") in part to avoid having to join all the other owners in the subdivision in their lawsuit. *See In re Kappmeyer*, 668 S.W.3d 651, 658 (Tex. 2023) (holding that the property owners were not required to join all owners in the subdivision in its lawsuit against the property owner association to challenge the enforceability of amendments to the subdivision's deed restrictions). Whether the amendments are enforceable against Swan Point's future purchasers is an issue not properly before us, and we decline to address the issue to the extent the Martins raise it in their appellate brief. *See id.*; *see also Adlong v. Twin Shores Prop. Owners Ass'n*, No. 09-21-00166-CV, 2022 WL 869801, at *11 (Tex. App.—Beaumont Mar. 24, 2022, pet. denied) (mem. op.) (rejecting appellants' argument that the restriction on leasing short term rentals "should only apply to new property owners," finding "[n]o language in the" restrictions or amendment suggesting that limitation and "no Texas case directly on point that would require that result").

writ) (holding newly passed restrictive covenant was enforceable because it was reasonable). We note that the Martins' argument is similar, if not identical, to the appellants in *Cauthorn*, *Chu*, and *Adlong*, and the Texas Supreme Court denied review in each case. *See Cauthorn*, 679 S.W.3d at 882; *Chu*, 652 S.W.3d at 903–04; *see also Adlong*, 2022 WL 869801, at *11. Seemingly then, the Court has had opportunity to address this approach and has refused to do so. *See Chu*, 652 S.W.3d at 904 (noting that the Texas Supreme Court has "signaled its approval of amendments" that prohibit short term rentals). We decline to adopt the standard proposed by the Martins and proceed with our analysis accordingly.

## C.     Analysis

### 1.     Condition One

The parties do not dispute that the first condition—whether the instrument creating the original restrictions establishes both the right to amend such restrictions and the method of amendment—has been met under the 2006 Declaration's amendment clause. *See Cauthorn*, 679 S.W.3d at 879; *Hanchett*, 696 S.W.2d at 615. The parties agree that the 2022 amendments were passed pursuant to the amendment procedure established in the 2006 Declarations.

We thus direct our analysis to whether the 2022 amendments correct, improve, or reform the 2006 Declarations rather than destroy it, and whether the amendments are illegal or violate public policy. *See Cauthorn*, 679 S.W.3d at 879; *Hanchett*, 696 S.W.2d at 615. At issue in this case are the 2022 modifications or amendments that (1) restrict leasing on residential lots, (2) revive the expired Development Period, which gives the

14

Declarant four votes for every lot it owns, and (3) change the "uniform rate" of special assessments.

### 2. Condition Two

As stated supra, the second condition considers whether the amendment at issue destroys the deed restrictions as a whole, not individual restrictive covenants within the deed restrictions. *See Couch*, 10 S.W.2d at 974; *Cauthorn*, 679 S.W.3d at 879; *Sunday Canyon*, 978 S.W.2d at 658; *Baldwin*, 773 S.W.2d at 686.

In *Couch*, the Texas Supreme Court upheld "radical" amendments to a residential district's deed restrictions which changed the residential nature of "the particular block or blocks" within the residential district to allow building "business homes" on those blocks. 10 S.W.2d at 973–74. It held that while the amendments constituted a substantial change, the amendments did not destroy the overall deed restrictions. *Id.* at 974 ("Now, a change of these conditions in any or all respects is not a destruction of the contract, nor does it change the essential nature of the same. It is still a deed of conveyance.").

The Court considered the amendment clause in the deed restrictions, which stated that the "conditions, as far as they affect the property" could be amended "at any time" with "a vote of three-fourths of the owners of said streets, voting accorded to front foot holdings, each front foot counting as one vote." *Id.* at 973. The Court held that this provision gave the property owners the right to pass the amendments. *Id.* at 974 ("Such course has not destroyed the major contract, but the change wrought in it is in exact accordance with that contract."). It held that even if the amendments "completely destroyed or removed the [residential] restrictions within that district, nevertheless such

15

was clearly [the owners'] right under the power conferred" in the above clause. *Id.* at 974; *see also Baldwin*, 773 S.W.2d at 686.

The Martins contend that the amendments at issue destroy their "right to lease" under the 2006 Declarations. However, per the holding in *Couch*, the 2006 amendment clause gave members of the Association the ability to do precisely that. *See Couch*, 10 S.W.2d at 974. The amendment clause in the 2006 Declarations provides:

> The terms and provisions of these restrictions may be amended at any time when an instrument setting forth said changes and signed by those persons holding two-thirds (2/3) votes in the Association is placed on record in the real property records of Calhoun, County Texas.

The 2006 Declarations amendment clause contains similar language as the amendment clause in *Couch*; the terms or provisions therein were subject to amendment "at any time" by a majority vote of lot owners in the subdivision. *See id.* at 973. And here, the 2022 amendments generally restrict leasing on residential lots, revive aspects of the Declarant's voting ability, and change the rate at which special assessments are collected. These amendments do not "destroy" the deed restrictions. *See id.* at 974; *Baldwin*, 773 S.W.2d at 686. "The essential nature" of the agreement between the Martins and Swan Point, i.e., "a deed of conveyance" governed by the subdivision's declarations of covenants, conditions, and restrictions, remains intact. *See Couch*, 10 S.W.2d at 974 ("It could hardly be contemplated that an agreement whereby the subject-matter of the contract might, without the further consent of the one party, be amended by the other, could be so exercised as to destroy the entire contract, or even to change the essential nature of it. But this rule is in no w[ay] violated by the proposed amendments in this case."); *Baldwin*, 773 S.W.2d at 686.

16

Thus, we hold that the amendments satisfy the second condition and do not contemplate a "complete destruction" of the 2006 Declarations. *See Couch*, 10 S.W.2d at 974; *Cauthorn*, 679 S.W.3d at 881 (holding that the amendment establishing a minimum duration of leasing merely "reformed" the property owner's right to lease); *Sunday Canyon*, 978 S.W.2d at 656, 658 (holding that amendments which created a homeowners association with various powers did not destroy the subdivision's deed restrictions); *Baldwin*, 773 S.W.2d at 686. Even if the amendments "destroy" a particular right under the 2006 Declarations like the Martins contend, such power was granted by the amendment clause. *See Couch*, 10 S.W.2d at 974; *Sunday Canyon*, 978 S.W.2d at 656, 658; *Baldwin*, 773 S.W.2d at 686.

### 3. Condition Three

#### a. Amendment Restricting Leasing

We first address the 2022 amendment which added restrictions to leasing on residential lots. Specifically, the new restrictions prohibit residential lots from leasing dwellings (1) for short-term rentals, i.e., for periods of thirty days or less, (2) "in conjunction with a Commercial Lot for any business purpose" or "in connection with the business or commercial operations of a Commercial Lot," and (3) for any other period of time without written permission from the Association's Board of Directors.

As to the prohibition on short-term rentals, the First, Third, Ninth, and Fourteenth Texas Courts of Appeals have recently ruled that a general amendment clause can be used to amend covenants to restrict the minimum duration of leasing. *See Cauthorn*, 679 S.W.3d at 877, 882 (upholding restrictions on leasing for terms fewer than 90 days); *Chu*, 652 S.W.3d at 902–05 (upholding 180-day minimum restriction); *see also Angelwylde*

*HOA*, 2023 WL 2542339, at *3–4 (upholding twelve-month minimum restriction); *Adlong*, 2022 WL 869801, at *8–12 (upholding six-month minimum restriction); *Poole Point*, 2022 WL 869809, at *3–4 (upholding 90-day minimum restriction).

In each case, the courts concluded that the amendment did not violate public policy. *See Cauthorn*, 679 S.W.3d at 881; *Chu*, 652 S.W.3d at 904–05; *see also Angelwylde HOA*, 2023 WL 2542339, at *4–5; *Adlong*, 2022 WL 869801, at *11; *Poole Point*, 2022 WL 869809, at *4. For example, in *Cauthorn*, the First Court of Appeals considered whether an amendment restricting leasing for terms fewer than ninety days was "consistent with the overall plan of [the subdivision's] development." 679 S.W.3d at 880; *see also Angelwylde HOA*, 2023 WL 2542339, at *4–5 (considering whether amendment establishing a minimum duration of leasing was "consistent with the overall plan of development"); *Adlong*, 2022 WL 869801, at *11 (same); *Poole Point*, 2022 WL 869809, at *4 (same). It first concluded that the amendment clause in the subdivision's declaration of covenants gave the homeowners challenging the amendment "constructive notice of the possibility of amendment" because the covenants stated that they could be amended at any time. *See Cauthorn*, 679 S.W.3d at 880 (citing *Chu*, 652 S.W.3d at 903); *see also Angelwylde HOA*, 2023 WL 2542339, at *4; *Adlong*, 2022 WL 869801, at *11; *Poole Point*, 2022 WL 869809, at *3.

Looking at the overall restrictions, the court then held that the amendment did not violate public policy because the amendment "align[ed] with" the scheme of the original restrictions. *See Cauthorn*, 679 S.W.3d at 877–78, 881. It noted that the deed restrictions "state[d] the developer's desire to establish and preserve 'a uniform plan for the development' to benefit future owners." *Id.* at 877–78. The pre-amended or original

18

restrictions stated that lots in the subdivision were to "be used for residential purposes only," could only have "one detached single-family dwelling," and were prohibited from use for "commercial activity" and "certain temporary uses" or structures such as "trailers, tents, shacks, mobile homes, boats and motor vehicles." *Id.* at 878. The court also noted its holding was consistent with the Texas Supreme Court's opinion in *Tarr*, which suggested that a homeowner's association could amend its deed restrictions to restrict short-term leasing. *See id.* at 880 n.2, 881; *see also Tarr*, 556 S.W.3d at 277 ("[N]either the association nor Tarr attempted to amend the deed restrictions to specify a minimum duration for leasing—an option available to both of them under the deed's amendment provisions."); *Poole Point*, 2022 WL 869809, at *4 (noting that *Tarr* "indicate[s] that amending deed restrictions is an appropriate method for specifying a minimum duration for leases in a residential subdivision").

Here, the preamble to the 2006 Declarations stated that the "Declarant's desire [is] to create and carry out a general and uniform plan for the improvement, development, maintenance, use and continuation of *a residential community* on the property" and to "enhance[e] and protect[] the value, desirability and attractiveness of said properties." (Emphasis added). The declarations, similar to the restrictive covenants or deed restrictions in *Cauthorn*, limit residential lots to "residential use only," prohibit the residential lots for any business, professional, commercial, or manufacturing use, and prohibit the construction of "garage apartments or apartment houses" and mobile or other temporary housing. *See* 679 S.W.3d at 878, 881. Only one "single family dwelling" is allowed to be constructed on the lots, and such dwellings are subject to various building restrictions within the declarations. The 2006 Declarations exclude commercial lots from

19

the residential use restrictions and state that commercial lots are to be used "for the commercial purpose of lodging paying guests and operating a business for chartering fishing, hunting and other tours for such guests."

Adopting the reasoning of our sister courts, we conclude that the amendment prohibiting short-term rentals is consistent with the "residential" purpose of the 2006 Declarations and furthers existing residential restrictions. *See id.*; *see also Angelwylde HOA*, 2023 WL 2542339, at *5 (holding that amendment prohibiting short-term rentals was valid and enforceable in part because it was consistent with the "residential" purpose of the deed restrictions and "reinforced the existing residential use restriction and the prohibition against commercial activities"); *Adlong*, 2022 WL 869801, at *11 ("The record evidence provides no basis for this Court to conclude that the 2020 Amendment does not further the purposes stated in the previous restrictions."); *Poole Point*, 2022 WL 869809, at *4 ("The minimum duration requirement created by the Amendment reinforced the existing residential use and occupancy restriction and the prohibition against commercial activities.").

The Martins argue that the holdings in these cases are "logically unsound and wrong." They argue that restricting residential leasing, "including short durations of leasing," does not further a subdivision's "residential purpose" because of the holding in *Tarr*. In that case, the Texas Supreme Court held that the homeowners association could not restrict Tarr, a homeowner in the neighborhood, from renting his home for terms of thirty days or less. 556 S.W.3d at 276–78. The neighborhood's deed restrictions required all tracts to "be used solely for residential purposes," and prohibited the tracts from being used for "business purposes"; however, the restrictions did not define these terms. *Id.* at

20

277. Looking at the deed restrictions "as a whole in light of the circumstances present when the parties entered the agreement," the Court concluded that deed restrictions did not prohibit short term rentals. *Id.* at 288–89, 290–91. The deed restrictions did not "address leasing, use as a vacation home, short-term rentals, minimum-occupancy durations, or the like," nor required "owner occupancy or occupancy by a tenant who uses the home as his domicile." *Id.* at 290. "Instead, the covenants merely require[d] that the activities on the property comport with a 'residential purpose' and not a 'business purpose.'" *Id.* at 290–91. The Court, however, "recognize[d] that another court may reach a different conclusion if the covenant it reviews defines 'residential' or 'business' uses by specifically enumerating prohibited conduct." *Id.* at 291.

We reject the Martins' contention that *Tarr* stands for the proposition that restrictions on leasing do not further a "residential purpose." The Court acknowledged that its holding was limited to the deed restrictions in that case. *Id.* ("[W]e confine this interpretation to the unambiguous language of these particular restrictive covenants."). The Court merely held that, absent a more particular definition or enumerated prohibited conduct, short-term rentals fall within the definition of "residential purposes." *See id.* In fact, *Tarr* strengthens our analysis because unlike the deed restrictions in that case, the 2006 Declarations here included "specifically enumerate[ed] prohibited conduct," such as the construction of garage apartments, apartment houses and mobile or other temporary housing, evidencing an intent to prevent short-term use on residential lots. *See id.*

The Martins next argue that the amendment restricting leasing violates public policy because it is not consistent with the 2006 Declaration's "express, unrestricted right to lease." We disagree. In *JBrice Holdings, L.L.C. v. Wilcrest Walk Townhomes Ass'n*,

21

the Court held that language in a subdivision's declaration of covenants "explicitly forbid restraints on an owner's right to lease." 644 S.W.3d 179, 181–82 (Tex. 2022). In that case, a homeowners association passed a rule that essentially banned short-term rentals to prevent an owner in the neighborhood from leasing his townhome. *Id.* at 182–83. The association's declaration of covenants provided that leases had to "be in writing" and were subject to "the provisions of the Declaration, Articles of Incorporation and By-laws of the Association," but "*[o]ther than the foregoing, there [were to] be no restriction[s] on the right of any townhouse owner to lease his unit.*" *Id.* at 182. The Court found that "'[n]o restriction' means no restriction" and held that "[a]bsent an express covenant or bylaw," the association could not enforce the newly passed rule. *Id.* at 187–88. The Court noted, however, that the association could restrict leasing by passing an amendment pursuant to the amendment procedure in the declarations. *Id.* at 188 ("Should seventy-five percent of the townhome owners agree, the deed restrictions permit the neighborhood to amend the covenants to restrict leasing.").

In contrast, the 2006 Declarations have no such language protecting "unrestricted" leasing. There is only one mention of leasing in the 2006 Declarations. It states that leasing on a residential lot "shall not be construed as a business." Here, unlike the language in *JBrice Holdings*, the 2006 Declarations do not "explicitly forbid restraints on an owner's right to lease." *See id.* at 181–82, 187–88; *see also Angelwylde HOA*, 2023 WL 2542339, at *4 (finding that the deed restrictions did not grant the dissenting homeowners "an absolute right to lease their residences" because the restrictions "expressly state[d] that any conveyance of the land [wa]s subject to the 'covenants . . . laid out in the declaration'" and it was undisputed that the deed restrictions could be

22

amended). Moreover, as the Court noted in *JBrice Holdings*, even if the 2006 Declarations did contain such language, the declarations could be amended to restrict leasing. *See JBrice Holdings*, 644 S.W.3d at 188.

Based on the foregoing, we conclude that the other two restrictions on leasing are also consistent with the overall plan of the subdivision's development. The preamble states that the purpose of the declarations is to develop the subdivision as a "residential community." The 2006 Declarations limit residential lots for "residential purposes" only and prohibit residential lots for business or commercial use. Thus, the amendment which prohibits residential lots from being leased in connection with a business on a commercial lot furthers existing restrictions by continuing to prohibit residential lots for business or commercial use. *See Tarr*, 556 S.W.3d at 290–91; *Cauthorn*, 679 S.W.3d at 881. The amendment restricting all other leasing without written permission of the Board furthers the purpose of the 2006 Declarations because it gives the Association greater control "to create and carry out a general and uniform plan" to develop a residential community. *See Tarr*, 556 S.W.3d at 290–91; *Cauthorn*, 679 S.W.3d at 881. Finally, the amendments do not violate any law or "some well-established rule of law." *See Teal*, 593 S.W.3d at 339; *see, e.g.*, *Roddy v. Holly Lake Ranch Ass'n, Inc.*, 589 S.W.3d 336, 344 (Tex. App.—Tyler 2019, no pet.) (holding that amendments to subdivision's declaration of covenants were void because they violated statutes under the Texas Business Organizations Code).

We conclude that the restrictions on leasing residential lots in the 2022 Declarations are not illegal and do not violate public policy. *See Teal*, 593 S.W.3d at 339; *Cauthorn*, 679 S.W.3d at 881; *Chu*, 652 S.W.3d at 904–05; *see also Angelwylde HOA*, 2023 WL 2542339, at *4; *Adlong*, 2022 WL 869801, at *11–12; *Poole Point*, 2022 WL

23

869809, at *3–4. Accordingly, we hold that the restrictions on residential leasing are enforceable against the Martins, and the trial court erred when it granted declaratory relief in part. *See Teal*, 593 S.W.3d at 339; *Cauthorn*, 679 S.W.3d at 881; *Chu*, 652 S.W.3d at 904–05; *see also Angelwylde HOA*, 2023 WL 2542339, at *4; *Adlong*, 2022 WL 869801, at *11–12; *Poole Point*, 2022 WL 869809, at *3–4.

### b.    Amendment Reviving the Development Period

The next amendment at issue revives the Development Period. The Development Period is the period of time in which the Declarant has four votes for every lot it owns, while other lot owners have one vote per lot. The Development Period in the 2022 Declarations expires on December 31, 2032, or until "total votes outstanding in Class A membership equal or exceed the total votes outstanding in Class B membership," or before December 31, 2032, if the Declarant so choses by recording a written instrument in the Calhoun County real property records, whichever occurs earlier. When the Development Period expires, the Declarant reverts to a "Class A" member and has one vote per lot it owns.

It is unclear how this amendment is either consistent or inconsistent with the 2006 Declarations because it extends or revives an expired provision. The amendment retains the same language as the "Development Period" provision from the 2006 Declarations and merely changes the period's expiration date from December 31, 2013, to December 31, 2032.

However, courts should refrain from "nullifying" a restrictive covenant unless it "contravenes some positive statute or some well-established rule of law." *Teal*, 593 S.W.3d at 338. In *Teal*, the Court considered whether a restrictive access easement

24

violated public policy. *Id.* at 338–39. The Court upheld the easement restriction, reasoning:

> [B]ad policy—which often lies in the eye of the beholder—does not automatically dispel an otherwise enforceable deed restriction. Our authority under the common law to declare a valid contractual provision void is tempered by relevant expressions of public policy from the legislature. Simply put, when the legislature has spoken on the topic, we generally consider its statutory enactments to be expressions of public policy. And the legislature has spoken extensively about restrictive covenants, both upholding their enforcement and setting limits. These legislative decisions to regulate and even prohibit some restrictive covenants—but not restrictive easements like this one—militate against this Court's exercise of its common-law authority. The legislature has told us that a restrictive covenant not proscribed by statute should be "liberally construed to give effect to its purpose and intent." TEX. PROP. CODE [ANN.] § 202.003(a).
>
> Nor is it clear to us that the common law suggests a public policy that contravenes this restrictive easement. [Appellant] points out that we have said covenants restricting the free use of land "are not favored." But for over a century we have enforced them. We can discern no "well-established rule of law" that compels us to put a common-law thumb on the public-policy scale either way in this case.

*Id.* at 339 (internal footnotes omitted). We can find no law or well-established rule of law that this amendment violates. *See id.*; *see also Trethewey v. Collins*, No. 03-07-00311-CV, 2009 WL 790284, at *2, *3–4 (Tex. App.—Austin Mar. 27, 2009, no pet.) (mem. op.) (holding that landowners had ability to pass modifications to the subdivision's deed restrictions which revived an expired restriction prohibiting motor homes on the lots).

We note that this amendment necessarily gives the Declarant the unilateral right to amend the subdivision's deed restrictions until the Development Period expires because the Declarant still owns most of the lots in the subdivision. However, Texas courts have long upheld the ability for a developer to unilaterally amend restrictive covenants. *See Dyegard Land P'ship v. Hoover*, 39 S.W.3d 300, 314 (Tex. App.—Fort

25

Worth 2001, no pet.) ("*Baldwin*, as well as other cases in Texas and other jurisdictions, recognize the validity of provisions reserving the unilateral right of the developer to amend, alter, or annul restrictive covenants." (citing *Baldwin*, 773 S.W.2d at 684–86));

*see also Nelson v. Jordan*, 663 S.W.2d 82, 85 (Tex. App.—Austin 1983, writ ref'd n.r.e.)

("Texas courts have never held that mere reservation by a grantor of a power to change or cancel a restrictive covenant, in and of itself, renders the covenants unenforceable.").

Moreover, as already established, this amendment was properly passed according to the amendment clause in the 2006 Declarations. While it seems antithetical that a majority of lot owners voted to give the Declarant weighted voting power, we are restrained from holding that the amendment here is unenforceable on perceived "bad policy" alone.[10] *See Teal*, 593 S.W.3d at 339. Accordingly, we hold that the amendment reviving the Development Period is not illegal and does not violate public policy, and the trial court erred when it granted declaratory relief in part. *See id.*

c. **Amendment to the Rate of Special Assessments**

The last amendment at issue changes the rate of special assessments to a rate "based upon the percentage of contribution of the condition" by each property owner:

> Special Assessments shall be in an amount and at rates determined by the Board of Directors based upon the percentage of contribution to the condition being remedied by the Special Assessment by the individual Lot Owners, which determination shall be made by the Board of Directors in good faith.

---

[10] Any amendment passed by the Declarant must still satisfy the three conditions: the amendment must be passed by the method of amendment set forth in the declarations, must not "destroy" the subdivision's declaration of covenants, and must not be illegal or violate public policy. *See Hanchett v. E. Sunnyside Civic League*, 696 S.W.2d 613, 615 (Tex. App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.).

The amendment also (1) revives the Declarant's ability to vote on special assessments and (2) removes the Declarant's obligation to pay fifty percent of the special assessment attributable to its lots.[11] We turn to whether the amendment furthers, or is consistent with, the 2006 Declarations or overall plan of development. *See Cauthorn*, 679 S.W.3d at 881.

The 2006 Declarations provide that, like the annual assessment, the special assessment "shall be fixed at a uniform rate." Each lot bore the cost of annual and special assessments equally, except lots owned by "the Declarant, its successors or assigns and Builders, as defined herein," who "shall pay fifty percent (50%) of annual and special assessments attributable to their Lots." As mentioned, the purpose of the 2006 Declarations is "to create and carry out a *general and uniform plan* for the improvement, development, maintenance, use and continuation of a residential community on the property." (Emphasis added). The preamble also states that the covenants and restrictions therein "*shall inure to the benefit of each Owner thereof*." (Emphasis added).

The purpose of the 2006 Declarations is to create a *uniform* plan for the improvement, development, and maintenance of the community and that the restrictive covenants benefit *each* owner in the subdivision. Changing the rate of special assessments to a percentage based on a lot owner's "contribution" to the condition eliminates uniformity. This is evident from the facts of this case: 79% of the special assessment was levied against the Martins and the remaining portion was divided among the Declarant and the other residential lot owners. Therefore, we conclude that the

---

[11] The Declarant is still responsible for paying 50% of the annual assessment attributable to its lots and paying its respective percentage of the special assessment under the 2022 Declarations.

amendment changing the rate of special assessments neither furthers, nor is consistent with, the 2006 Declarations or overall plan of development. *See id.*

Further, this amendment violates common law principles of restrictive covenants. "[T]he basic concept underlying the use of restrictive covenants [is] that each purchaser in a restricted subdivision is subjected to the burden and entitled to the benefit of the covenant." *Davis v. Huey*, 620 S.W.2d 561, 568 (Tex. 1981). "A declaration containing restrictive covenants in a subdivision defines the rights and obligations of property ownership, and the mutual and reciprocal obligation undertaken by all purchasers in a subdivision 'creates an inherent property interest possessed by each purchaser.'" *W. Hills Harbor Owners Ass'n v. Baker*, 516 S.W.3d 215, 220 (Tex. App.—El Paso 2017, no pet.) (quoting *Inwood N. Homeowners' Ass'n, Inc. v. Harris*, 736 S.W.2d 632, 636 (Tex. 1987)). "The buyer submits to a burden upon his own land because of the fact that a like burden imposed on his neighbor's lot will be beneficial to both lots." *Tarr*, 556 S.W.3d at 279–80 (citing *Curlee v. Walker*, 244 S.W. 497, 498 (Tex. 1922)). "Consequently, the covenant 'between the original owner and each purchaser is . . . mutual.'" *Id.* (quoting *Curlee*, 244 S.W. at 498).

In *Zent v. Murrow*, the Austin Court of Appeals concluded that any action taken by property owners to alter, extend, or revoke existing restrictions must apply to all of the properties which are subject to them. 476 S.W.2d 875, 878 (Tex. App.—Austin 1972, no writ). The court reasoned:

> The language employed by the subdividers . . . shows an intent to establish a general plan applicable to the whole section. A rule that would permit the majority of the lot owners to alter or revoke the restrictions as to a few lots only, and to continue the covenants as to all other property in the section, would invite foreseeable mischiefs not within the original purposes of the

28

subdividers. The most obvious of such mischiefs to result are uncertainties and possible discriminations.

*Id.* at 878. "The holding in *Zent* has been recognized by numerous appellate courts in Texas as well as by courts in other jurisdictions." *Teal Trading & Dev., LP v. Champee Springs Ranches Prop. Owners Ass'n*, 534 S.W.3d 558, 585 (Tex. App.—San Antonio 2017), *aff'd*, 593 S.W.3d 324 (Tex. 2020).

Here, special assessments were originally set to burden all lots equally for the benefit of defraying "the cost of any construction, reconstruction, repair or replacement of a capital improvement upon the Common Area." However, this amendment removes some of the burden, i.e., the cost, from lot owners who still maintain the full benefit, i.e., maintained common areas in the subdivision. *See Tarr*, 556 S.W.3d at 279–80; *Davis*, 620 S.W.2d at 568; *Baker*, 516 S.W.3d at 220; *Zent*, 476 S.W.2d at 878. We also find the facts in this case particularly troubling. The Declarant first attempted to effectuate this amendment in 2019 *after* the roads in the subdivision deteriorated and *after* the Association received bids to fix the roads. These facts signal that the Declarant intended to change the declarations to avoid having to pay the brunt cost of the road repairs. This is precisely the type of "foreseeable mischiefs" that *Zent* forewarned. *See Zent*, 476 S.W.2d at 878.

Swan Point points to *Sunday Canyon* for authority that these amendments are valid and enforceable. In that case, the Amarillo Court of Appeals upheld amendments to the original deed restrictions in the Sunday Canyon residential subdivision. 978 S.W.2d at 658. The amendments, properly ratified by a majority vote of property owners according to the amendment clause in the original restrictions, (1) created the Sunday Canyon

29

Property Owners Association (SCPOA), (2) granted each lot owner membership of the SCPOA "entitled to one vote for each lot owned," (3) "empowered" SCPOA to, among other things, "levy charges and assessments against the lots to maintain, preserve and improve the roads, water system, and common areas of the subdivision," (4) and established that "[a]ll charges and assessments . . . were stated to be a lien on each lot against which they were assessed, and the personal obligation of the owner of the lot." *Id.* at 656. The Amarillo court upheld all the modifications, reasoning that property owners in the subdivision had the right "to contract with relation to their property as they see fit in the absence of contraventions of public policy and positive law," and such amendments were not illegal or against public policy. *See id.* at 658.

Swan Point also points to various other cases for authority that the amendment here is enforceable. *See Wilchester*, 177 S.W.3d at 562–66 (upholding an amendment which increased annual assessment to pay for new club facilities); *Holleman*, 556 S.W.2d 632, 635–37 (upholding an amendment which prohibited homeowners from parking in their driveways—as opposed to their garages—overnight); *Harrison*, 533 S.W.2d 108, 111 (upholding an amendment in a subdivision "for people who like airplanes" which required a home to be built on the lot before an airplane hangar); *see also Winter v. Bean*, No. 01-00-00417-CV, 2002 WL 188832, at *1–3 (Tex. App.—Houston [1st Dist.] Feb. 7, 2002, no pet.) (mem. op.) (upholding amendments which prevented landowners from subdividing their lot). Swan Point essentially argues that since the amendments in these cases were held to be enforceable, the amendment here should be upheld.

However, we find these cases distinguishable: the amendments therein applied equally to all owners. *See Wilchester*, 177 S.W.3d at 556; *Sunday Canyon*, 978 S.W.2d

30

at 656; *Holleman*, 556 S.W.2d 632, 635; *Harrison*, 533 S.W.2d at 110; *see also Winter*, 2002 WL 188832, at *1. None of the amendments attempted to change the benefit or burden from the original deed restrictions unevenly across lot owners nor did the facts of those cases indicate some underlying mischief by the original developer. *See Wilchester*, 177 S.W.3d at 556; *Sunday Canyon*, 978 S.W.2d at 656; *Holleman*, 556 S.W.2d 632, 635; *Harrison*, 533 S.W.2d at 110; *see also Winter*, 2002 WL 188832, at *1. And here, we can point to common law principles of restrictive covenants that this amendment violates. *See Teal*, 593 S.W.3d at 338 (holding that nothing under "the common law suggests a public policy that contravenes" the restrictive easement at issue in the case). We hold that the amendment changing the rate of special assessments is invalid and unenforceable and affirm the trial court's judgment on this claim.[12]

In conclusion, we sustain Swan Point's first issue in part. We affirm the trial court's judgment insofar as it grants declaratory relief that the amendment changing the rate of special assessments is unenforceable against the Martins and to the extent it denied Swan Point's motion for the same. We reverse the trial court's judgment granting declaratory relief that the amendments which restrict leasing and revive the Development Period are unenforceable against the Martins and to the extent it denied Swan Point's

---

[12] We note that the Martins argue that all of the 2022 amendments violate public policy because they are unconstitutional. However, the Martins cite no relevant authority where similar restrictive covenants were deemed invalid because they were found to be unconstitutional. Accordingly, the Martins have not shown that the amendments here are unconstitutional. *See Cauthorn*, 679 S.W.3d at 883; *Chu v. Windermere Lakes Homeowners Ass'n, Inc.*, 652 S.W.3d 899, 904 (Tex. App.—Houston [14th Dist.] 2022, pet. denied) ("[Appellant] cites no authority invalidating a restrictive covenant concerning short-term rentals, or any other type of restrictive covenant, based on constitutional limitations other than racial discrimination.").

motion for the same, and render declarations that such amendments are valid and enforceable against the Martins.

### III.    REMAINING CLAIMS

Swan Point next contends that the trial court erred when it (1) granted the Martins' traditional motion for summary judgment on its claim for breach of restrictive covenants and enjoined Swan Point "from assessing [the Martins] more than assessments dictated and allowed by the 2006 restrictive covenants," (2) granted the Martins' summary judgment motion on its claim for quiet title, and (3) dismissed Swan Point's counterclaims for breach of restrictive covenant, unjust enrichment, and lien foreclosure.

The trial court granted the Martins' motion for summary judgment on its claims for breach of restrictive covenants and quiet title based on "the foregoing declaratory relief." Based on that judgment, the trial court then dismissed Swan Point's counterclaims. Because we held that two of the amendments at issue are enforceable against the Martins, we reverse and remand these issues back to the trial court to determine whether the declaratory relief decided here resolves these claims.

Lastly, Swan Point contends that the trial court erred when it granted attorney's fees for the Martins. According to the trial court's judgment, it awarded attorney's fees under § 5.006 of the Texas Property Code and, alternatively, "pursuant to Chapter 37 of the Texas Practice and Remedies Code, the Texas Uniform Declaratory Judgment Act [(UDJA)]." *See* TEX. PROP. CODE ANN. § 5.006 ("Attorney's Fees in Breach of Restrictive Covenant Action"); TEX. CIV. PRAC. & REM. CODE ANN. § 37.009.

Under § 5.006, a trial court awards mandatory attorney's fees to the "prevailing party" in a suit for breach of restrictive covenant pertaining to real property. TEX. PROP.

32

CODE ANN. § 5.006(a). Under the UDJA, the trial court "may award costs and reasonable and necessary attorney's fees as are equitable and just" in claims for declaratory relief. TEX. CIV. PRAC. & REM. CODE ANN. § 37.009. Because we remanded the parties' breach of restrictive covenants claims and reversed in part the trial court's judgment granting declaratory relief, we therefore reverse the award of attorney's fees and remand for the trial court's reconsideration of this matter. *See* TEX. PROP. CODE ANN. § 5.006; TEX. CIV. PRAC. & REM. CODE ANN. § 37.009; *Marsh v. Frost Nat. Bank*, 129 S.W.3d 174, 180 (Tex. App.—Corpus Christi–Edinburg 2004, pet. denied) (reversing and remanding award of attorney's fees under the UDJA because "the trial court may wish to reconsider the award of attorney's fees"); *see also Adlong*, 2022 WL 869801, at *13 ("A court may decide that fees should not be awarded if such an award would not be equitable and just in light of all the circumstances.").

## IV.   CONCLUSION

We affirm in part and reverse and render in part the trial court's judgment granting the Martins' motion for summary judgment and denying Swan Point's motion for summary judgment on the claims for declaratory relief. We reverse and remand all remaining issues, including the parties' remaining claims and award of attorney's fees, for further proceedings consistent with this opinion.

JON WEST<br>
Justice

Delivered and filed on the
29th day of May, 2025.